## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

**SEAN MACMASTER**,

          Plaintiff,

vs.

**DAVID BUSACCA**, individually;
**BRIAN KOLODZIEJ**, individually;
**MICHAEL GERALD**, individually and in his official capacity;
**LAUREN SCHIPANI**, individually;
**JOHANNA MACMASTER**, individually; and
**LAURA MOODY,** individually;
      jointly and severally.

Case No.
Hon.

_____/

Joshua Blanchard (P72601)
Keeley D. Blanchard (P68661)
Melissa C. Freeman (P80075)
**BLANCHARD LAW**
Attorneys for Plaintiff
309 S Lafayette St., Ste 208
PO Box 938
Greenville, MI 48838
616-773-2945 / fax: 616-328-6501
josh@blanchard.law

_____/

1

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Sean MacMaster, by his counsel, BLANCHARD LAW,

complains against Defendants, jointly and severally, as follows:

## JURISDICTION AND VENUE

1.      This is a civil action seeking damages against Defendants for committing acts under color of law, and depriving Plaintiff of rights secured by the Constitution and laws of the United States.

2.      Upon information and belief, Defendant Busacca is a citizen of the State of Michigan and a resident of the Eastern District of Michigan.

3.      Upon information and belief, Defendant Kolodziej is a citizen of the State of Michigan and a resident of the Eastern District of Michigan.

4.      Upon information and belief, Defendant Gerald is a citizen of the State of Michigan and a resident of the Eastern District of Michigan.

5.      Upon information and belief, Defendant Schipani is a citizen of the State of Michigan and a resident of the Eastern District of Michigan.

6.      Upon information and belief, Defendant Moody is a citizen of the State of Michigan and a resident of the Western District of Michigan.

7.      Upon information and belief, Defendant Johanna MacMaster ("Johanna") is a citizen of the State of Michigan and a resident of the Eastern District of Michigan.

8.      At all relevant times, Defendant Busacca was acting in his capacity as a police officer for the Michigan State Police.

9.   At all relevant times, Defendant Busacca was acting within the scope of his respective employment under color of law, cloaked with the authority which was granted to him.

10.  At all relevant times, Defendant Gerald was acting in his capacity as a police officer for the Center Line Department of Public Safety.

11.  At all relevant times, Defendant Gerald was acting within the scope of his respective employment under color of law, cloaked with the authority which was granted to him.

12.  At all relevant times, Defendant Schipani was acting in her capacity as Special Agent investigating for Michigan Department of Attorney General.

13.  At all relevant times, Defendant Schipani was acting within the scope of her respective employment under color of law, cloaked with the authority which was granted to her.

14.  At all relevant times, Defendant Moody was acting in her capacity as Chief of Staff for Michigan Department of Attorney General.

15.  At all relevant times, Defendant Moody was acting within the scope of her respective employment under color of law, cloaked with the authority which was granted to her.

16.  At all relevant times, Defendant Kolodziej was acting under color of law, cloaked with the authority which was granted to him.

17.  This cause of action arose in the County of Oakland, State of Michigan.

18.  Venue is proper in this Court pursuant to 28 U.S.C. §1391.

19.  The Court has jurisdiction of this action under 42 U.S.C. §1983 and under 28 U.S.C. §1343.

20.    The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §1331.

21.    Plaintiff Sean MacMaster ("Sean") is a citizen and resident of the State of Florida and a citizen of the United States.

22.    At all times material to this Complaint, these Defendants acted toward Plaintiff under color of the statutes, ordinances, customs and usage of the State of Michigan.

23.    While acting in their various capacities, the Defendants deprived Plaintiff of his liberty without due process of law and made an unreasonable search and seizure of the person and property of Plaintiff, thereby depriving Plaintiff of his rights, privileges and immunities as guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

## COMMON ALLEGATIONS OF FACT

### Kolodziej's Career Background

24.    Plaintiff incorporates the preceding paragraphs as if restated herein word-for-word and paragraph-by-paragraph.

25.    Brian Kolodziej ("Kolodziej") is a lawyer who has been licensed to practice law in the State of Michigan since November 2, 2012.

26.    Upon information and belief, Kolodziej worked as an assistant prosecuting attorney in Macomb County from March of 2015 to September of 2018.

27.    In his role as assistant prosecuting attorney in the Macomb County Prosecutor's Office, Kolodziej was assigned to handle sexual assault cases.

28.    In October of 2018, Kolodziej was hired by former Michigan Attorney General Bill Schuette as an Assistant Attorney General.

29. As Assistant Attorney General, Kolodziej worked in a special position prosecuting sexual assault cases.

30. Kolodziej's position was funded by the US Department of Justice through a grant under the Violence Against Women Act.

31. The $900,000 grant funded the prosecution and investigation of alleged sexual assaults involving adult victims that were complex or cold cases.

32. Kolodziej, during his employment at the Macomb County Prosecutor's Office and the Michigan Attorney General's Office, went outside his prosecutorial role.

33. Kolodziej went outside his prosecutorial role by, among other actions, engaging in activities traditionally associated with law enforcement investigators and not prosecutors.

34. Kolodziej went outside of his prosecutorial role in order to advance his personal and romantic interests.

### Kolodziej's Romantic Relationship with Johanna's Family Member

35. While working at the Macomb County Prosecutor's Office, Kolodziej met a woman whose initials are V.S.

36. At all relevant times, V.S. worked at the Macomb County Prosecutor's Office.

37. Upon information and belief, Kolodziej and V.S. engaged in a romantic relationship during their employment at the Macomb County Prosecutor's Office.

38. V.S. has a cousin named Johanna MacMaster ("Johanna").

39. Beginning in 2012 and continuing to present, Johanna has been involved in a custody dispute over her young daughter, AM, with her ex-husband, Sean MacMaster ("Sean").

### Johanna's Repeated Failed Accusations Against Sean

5

40. During the course of the custody dispute in 2016, Johanna falsely accused Sean of sexually abusing AM.

41. Johanna made the false accusation of sexual abuse in order to gain an advantage in the custody dispute.

42. Johanna knew the sexual abuse accusations were false at the time she made them.

43. Johanna reported her false accusations in January of 2016 to the Oakland County Sheriff's Department ("OCSD").

44. Johanna also reported her false accusations to Child Protective Services ("CPS) in January of 2016.

45. Johanna planned to leverage the criminal investigation and CPS investigation to gain full custody of AM.

**Johanna's Trip to Florida to Extort Sean**

46. In January 2016, Johanna traveled to Florida to attempt to extort Sean into releasing his parental rights.

47. On January 23, 2016, Johanna and Sean met at a McDonald's in Florida.

48. Johanna lied to Sean in an attempt to get him to sign a document releasing his parental rights to AM.

49. Johanna lied to Sean that a neighbor made a report about AM being sexually abused.

50. In fact, Johanna was the one who had reported the false accusations to the OCSD and CPS.

51. Johanna told Sean that because of the neighbor's report, AM had to go to the hospital for an evaluation and to do a forensic interview.

52. In fact, it was Johanna's false accusations that led to AM being needlessly evaluated at a hospital and participating in a forensic interview.

53. Johanna threatened that Sean's mother would be considered an accomplice and implied she could be arrested.

54. Johanna lied that AM had implicated Sean's step-father in the alleged abuse, though AM would not make these claims until months later.

55. Johanna falsely claimed that Sean would be served with the involuntary termination of his parental rights shortly.

56. In reality, the OCSD had informed Johanna that her and Sean's parental rights were not affected, and that Johanna must continue to comply with parenting time as ordered.

57. Johanna presented Sean with a Consent to Termination of Parental Rights drafted by an attorney.

58. Johanna pleaded with Sean to sign the document that would terminate his parental rights to AM.

59. Johanna falsely promised that if Sean signed the document, then the criminal investigation and CPS investigation would be dropped.

60. Johanna falsely claimed that Sean would not owe child support if he signed the document.

61. Johanna told Sean that it would "set him free financially" and that she knew he did not have the resources to fight the false criminal accusations, in an attempt to get Sean to sign the document.

62. Johanna referred to the document that would terminate Sean's parental rights to AM as a "gift" and a "get out of jail free card."

63. Knowing that he had done nothing wrong, Sean refused to sign the document that would have terminated his parental rights to AM.

64. Sean vehemently denied doing anything inappropriate to AM.

**Four Agencies Determine Johanna's Allegations are Baseless**

65. The OCSD investigated the false accusations made by Johanna.

66. The OCSD learned of Johanna's attempt to get Sean to terminate his parental rights.

67. The investigators from OCSD noted in their reports Johanna's attempt to extort Sean into releasing his parental rights.

68. The OCSD investigation did not substantiate the accusations made by Johanna.

69. The OCSD investigation revealed information that supports that Johanna was coaching AM to make false accusations against Sean.

70. Sean took two independent polygraphs, on February 6 and 7, 2016 concerning Johanna's accusations. Both indicated he was truthful when he denied the accusations.

71. On March 29, 2016, Sean took a police administered polygraph at the Oakland County Sheriff's Office concerning Johanna's accusations. Again, no deception was detected when Sean denied the accusations.

72. The Oakland County Prosecuting Attorney reviewed the investigation of the OCSD and declined to issue charges in the case.

73. The OCSD informed Johanna that the Oakland County Prosecuting Attorney had declined to file charges in the case.

74. Johanna was upset that no charges were filed.

75.  Johanna made additional false accusations against Sean concerning AM.

76.  Johanna also made false accusations against Sean's mother and stepfather ("the Orrs"), stating that they were also involved in sexually abusing AM.

77.  The OCSD conducted a second investigation of Johanna's accusations concerning AM.

78.  The OCSD obtained statements from the Orrs.

79.  The Orrs both passed polygraph examinations denying Johanna's new accusations.

80.  The second investigation by the OCSD did not substantiate any of the new accusations by Johanna.

81.  The Oakland County Prosecuting Attorney reviewed the second investigation of the OCSD and again declined to issue charges in the case against either Sean or the Orrs.

82.  Johanna was upset that for a second time, the prosecuting attorney declined to file criminal charges.

83.  In August of 2017, more than a year after the OCSD investigation, Johanna also reported the false accusations against Sean to the Michigan State Police Trooper Perkins at the post located in Lapeer County.

84.  Johanna reported her false accusations to the post in Lapeer County, despite making accusations that a crime occurred in Oakland County.

85.  Trooper Perkins of the Michigan State Police contacted the OCSD about Johanna's complaint.

86.  After discussing Johanna's accusations with the OCSD, Trooper Perkins closed his case and declined to reinvestigate.

87.   Johanna also initiated a third CPS investigation.

88.   Johanna also contacted the Federal Bureau of Investigation ("FBI") and again made false accusations against Sean.

89.   The FBI Investigators contacted the OCSD concerning Johanna's complaint.

90.   The OCSD gave the FBI complete access to their case file from the two investigations that were conducted by the OCSD concerning Johanna's complaints.

91.   After a review of the OCSD's case file, the FBI determined that further investigation of Johanna's complaints was not warranted.

92.   The CPS case was closed, finding that there was not a preponderance of the evidence to support that Sean was the perpetrator of sexual abuse on AM.

93.   Johanna was upset that the OCSD, the FBI, the Michigan State Police, and CPS had all refused to believe her false accusations of sexual abuse against Sean.

## Using his office, Kolodziej Pursues an Investigation Without Authority

94.   Upon information and belief, at a family gathering for Easter, Johanna asked V.S. to use her position as an employee in the Macomb County Prosecutor's Office to help Johanna pursue the false accusations against Sean.

95.   Upon information and belief, V.S. arranged a meeting between Kolodziej and Johanna.

96.   Upon information and belief, in April 2018 Kolodziej was in a romantic relationship with V.S.

97.   On April 10, 2018, Kolodziej met with Johanna.

98. Upon information and belief, during the meeting, Kolodziej agreed to investigate the accusations being made by Johanna.

99. At the time of the meeting in April 2018, Kolodziej was still an assistant prosecutor for Macomb County Prosecutor Eric Smith.

100. The accusations made by Johanna were not within the jurisdiction of the Macomb County Prosecutor's Office.

101. In April 2018, Kolodziej had no authority to prosecute crimes in Oakland County.

102. In April 2018, Kolodziej had no lawful authority to investigate the accusations being made by Johanna.

103. Investigating Johanna's accusations was not within the scope of Kolodziej's authority as an assistant prosecuting attorney in Macomb County.

104. Kolodziej pursued an investigation of Johanna's accusations despite having no authority to do so.

105. Upon information and belief, Kolodziej pursued the investigation of Johanna's accusations to benefit his romantic relationship with V.S.

**Kolodziej Recruits Det. Gerald for the Investigation**

106. During the course of his employment as an assistant prosecuting attorney in Macomb County, Kolodziej met a Center Line Police Detective named Michael Gerald ("Gerald").

107. Kolodziej had worked with Gerald on sexual assault cases in the past.

108. Upon information and belief, Kolodziej and Gerald were friends.

109. Upon information and belief, following the April 10, 2018 meeting with Johanna, Kolodziej contacted Gerald regarding Johanna's accusations.

110. Upon information and belief, Kolodziej requested that Gerald assist in Kolodziej's investigation of Johanna's accusations.

111. Upon information and belief, at the time Kolodziej contacted Gerald, Gerald was employed with the Center Line Police Department.

112. The Center Line Department of Public Safety is located in Macomb County.

113. Johanna had falsely accused Sean of committing a crime in Oakland County.

114. The Center Line Department of Public Safety had no jurisdiction to investigate Johanna's accusations within Oakland County.

115. Gerald had no authority to investigate Johanna's accusations.

116. After the April 10, 2018 meeting between Kolodziej and Johanna, Kolodziej arranged for Johanna to meet with Gerald.

117. Upon information and belief, Gerald agreed to meet with Johanna because he was friends with Kolodziej.

118. On April 25, 2018, Johanna met with Gerald.

119. Upon information and belief, during the April 25, 2018 meeting, Johanna provided Gerald with voluminous documents and materials concerning her false accusations.

120. Upon information and belief, Kolodziej and Gerald parsed through the voluminous documents provided by Johanna and organized them into binders.

121. Upon information and belief, Kolodziej and Gerald conducted an investigation of Johanna's accusations between April 2018 and October 2018 despite having no authority or jurisdiction.

122. In May of 2018, Kolodziej and Gerald met with Assistant Attorney General Kelly Carter ("Carter") to discuss Johanna's accusation.

123. At the time, Kolodziej was employed by the Macomb County Prosecutor's Office, but he made it clear he was not working in his capacity as a prosecutor during the meeting.

124. The purpose of the May 2018 meeting with Carter was to convince the Attorney General to charge Sean based on Johanna's false allegations.

125. Kolodziej requested Carter email him using his personal Gmail account.

126. Carter concluded that because Oakland County Prosecutor's Office had twice declined the case, it was not routine procedure to overrule county prosecutor charging decisions and they would not issue charges.

### Custody Battle Continues

127. Meanwhile, the custody battle between Johanna and Sean continued in Florida.

128. Johanna and Sean were married and AM was born in Florida.

129. Johanna and Sean separated in October 2012.

130. Johanna believed that the cause of the divorce was an extramarital affair.

131. On information and belief, Johanna was livid about the affair.

132. Following their separation, Johanna moved from Miami, Florida to Gainesville, Florida with AM.

133. Sean would drive five hours from Miami to Gainesville for parenting time and pay for transportation and lodging costs.

134. After the divorce was finalized, Johanna moved with AM to Michigan.

135. Sean remained in Florida.

136. The custodial agreement allowed Sean to see AM every other weekend.

137. Sean would fly from Florida to Michigan every other weekend to have parenting time with AM.

138. The parenting time took place at his mother and step-father's residence in Oxford, Michigan in Oakland County.

139. The custodial agreement included that when AM turned 5, she would have extended visits with Sean in Florida.

140. Following the divorce, Johanna threatened Sean multiple times with claims that she would have him fired from his employment and terminate his parental rights.

141. In December 2015, alimony payments and medical coverage for Johanna ended pursuant to the judgment of divorce.

142. Also in December of 2015, Johanna discovered that Sean had remarried.

143. In January of 2016, Johanna first made the false accusations against Sean.

144. After reporting the accusations to the OCSD, Johanna filed an emergency *ex parte* motion to suspend parenting time in the Florida family court.

145. The Florida family court held a contested hearing involving 17 witnesses and determined that the allegations were not trustworthy and lacked corroborating evidence.

146. While the motion was pending, Sean had been denied parenting time with AM.

147. The Florida family court ordered that AM and Sean begin reunification.

148. The Florida family court ordered that AM undergo an evaluation, and the parties agreed on using Dr. Katherine Jacobs.

149. On August 31, 2017, the parties received Dr. Jacob's report and assessment.

150. Dr. Jacobs concluded that it would be detrimental to AM to not have time with her father, that Johanna is the cause of AM's anxiety, and that there are signs of Munchausen syndrome.

151. Following the issuance of Dr. Jacobs' report, on September 6, 2017, Johanna made a new CPS complaint falsely alleging that Sean took nude photographs of AM.

152. On December 6, 2017, the parties agreed to use Dr. Tracey Stulberg for reunification therapy.

153. At AM's session with Dr. Stulberg on January 9, 2018, AM stated that "her truth" is that Sean never inappropriately touched her.

154. AM also told Dr. Stulberg that if AM did not say that Sean abused her, Johanna would go away for a long time.

155. Johanna was ordered by the Florida family court not to discuss the Dr. Stulberg therapy sessions with AM.

156. In direct violation of the Florida Court's order, Johanna spoke to AM about the therapy sessions.

157. During reunification therapy with Dr. Stulberg, Sean never missed a session.

158. During reunification therapy, AM would elect to have Sean sit next to her.

159. On information and belief, AM would hug Sean, have lots of eye contact, sit on his lap, and gave no indication whatsoever that she was worried about seeing him or that she did not want to be there.

160. On information and belief, AM would come to therapy sessions and tell Dr. Stulberg that Johanna said Dr. Stulberg was a bad person and that AM's maternal grandfather would call Dr. Stulberg a liar.

161. On information and belief, in February or March of 2018, AM told Dr. Stulberg that Johanna intended to stop the reunification therapy and go to court for AM to stop seeing Sean.

162. A psychologist by the name of Dr. Day came to reunification therapy and was supposed to do an evaluation to determine visitation and custody in September 2018.

163. It was ordered by the Florida court that AM be taken to therapy by either her maternal or paternal grandmother, or both in order to avoid the possibility that Johanna would continue to influence AM.

164. On November 1, 2018, at the therapy session with Dr. Day, Johanna took AM into a bathroom stall before therapy to discuss the therapy session in violation of the court order.

165. At the November 1 therapy session, AM behaved uncharacteristically rude and refused to have a productive meeting.

166. The following Tuesday, AM explained to Dr. Stulberg that she was told by Johanna that if Dr. Day decided that AM could go with Sean, AM would never see Johanna again.

167.  Johanna secretly brought AM to be interviewed by Dr. Robert Ortega and social worker Mary Ortega ("the Ortegas") at the Family Assessment Clinic.

168.  Johanna brought AM to be interviewed by the Ortegas during the time that she was court-ordered to engage AM in the therapy with Dr. Stulberg.

169.  The sessions with the Ortegas were in violation of the Florida family court orders.

170.  The Ortegas, using interview techniques inconsistent with the forensic interview protocol for interviewing children, interviewed AM six times over the course of ten days.

171.  On information and belief, Johanna brought AM to the Ortegas for the purpose of getting AM to make false accusations against Sean and to gain an advantage in her custody case.

172.  Through improper means the Ortegas elicited inconsistent and nonsensical accusations from AM over the course of the six interviews in August of 2018.

173.  On January 7, 2019, Johanna and Sean signed a mediation agreement setting forth a plan for an increase in parenting time for Sean and for overnights to begin in March of 2019 in Michigan and spring break in Florida.

174.  On the weekend of March 8 and 9, 2019, which was supposed to be Sean's first overnight with AM, Larry and Sean were handcuffed and held at gunpoint by police while their electronics were seized, carpets were cut from the house and removed, and Sean's cheek was swabbed for DNA as he was on the airplane about to take off to Florida causing him to miss his flight.

### Kolodziej Recruits Busacca

175. In October of 2018, Kolodziej was hired by the Michigan Attorney General's Office as an Assistant Attorney General.

176. In his role as Assistant Attorney General, Kolodziej was to prosecute sexual assault cases involving adult victims under a grant awarded through the United States Department of Justice under the Violence Against Women Act.

177. Prosecuting Johanna's false accusations did not fall within the scope of Kolodziej's employment as an Assistant Attorney General.

178. Despite that Kolodziej was not permitted to investigate or prosecute Johanna's accusations in his role as Assistant Attorney General, Kolodziej continued to conduct his own investigation.

179. On information and belief, in the summer of 2018, Kolodziej began contacting Michigan State Police Trooper David Busacca ("Busacca") concerning Johanna's accusations.

180. Kolodziej and Busacca had previous contact during their respective employment.

181. Upon information and belief, Kolodziej and Busacca spoke about the possibility of Busacca investigating Johanna's accusations.

182. During 2018, Busacca was assigned to the Michigan State Police Metro North Post.

183. Busacca was working the midnight shift assigned to the freeway during 2018.

184. Busacca's primary responsibility was to conduct traffic enforcement and respond to citizen requests for assistance.

185. Upon information and belief, Busacca wished to advance his career within the Michigan State Police.

186. Upon information and belief, Busacca was flattered that an attorney like Kolodziej from the Attorney General's Office would consider him for an investigation of what seemed like an important case.

187. Upon information and belief, Kolodziej persuaded Busacca that if he helped to investigate Johanna's accusations, it would be a great case to advance Busacca's career.

188. Busacca approached his post commander seeking permission to investigate Johanna's accusations.

189. Upon information and belief, the post commander talked to Kolodziej, who advocated for the post commander to allow Busacca to investigate Johanna's accusations.

190. The post commander then authorized Busacca to work on the case despite not having experience investigating sexual assault cases.

191. On November 4, 2018, Gerald provided the documents he had received from Johanna to Busacca.

192. Gerald provided the documents to Busacca at Kolodziej's request.

193. Kolodziej requested that Gerald provide the documents to Busacca to conceal Kolodziej's involvement in investigating the case and initiating the prosecution.

194. Gerald agreed with Kolodziej to assist in initiating the prosecution of Sean despite knowing that there was not probable cause to support the allegations.

195. On November 4, 2018, Busacca received the materials that had been organized into binders by Kolodziej and Gerald during their investigation.

196. Among the materials were the police reports of the prior investigations by the OCSD.

197. Kolodziej was aware of the evidence uncovered by the OCSD investigation that showed Johanna's accusations were false.

198. Gerald was aware of the evidence uncovered by the OCSD investigation that showed Johanna's accusations were false.

199. Busacca was aware of the evidence uncovered by the OCSD investigation that that showed Johanna's accusations were false.

200. Kolodziej, Gerald, and Busacca had reviewed the contents of the OCSD investigation including evidence that demonstrated that Johanna's allegations were false.

### Hagaman-Clark's Involvement

201. After recruiting Busacca to assist with the investigation, Kolodziej continued to work on the case while employed by the Attorney General despite being prohibited from working on the case due to the limitations imposed by his grant-funded position.

202. Kolodziej and Busacca met with Assistant Attorney General Danielle Hagaman-Clark ("Hagaman-Clark").

203. Kolodziej and Busacca provided Hagaman-Clark the file and told Hagaman-Clark that she would be the one to handle the case.

204. After meeting with Kolodziej and Busacca, Hagaman-Clark had a discussion with then AG Chief of Staff Laura Moody ("Moody") informing her that she did not have time for the case, nor was it what she was hired to do.

205. Upon information and belief, Kolodziej had already discussed the case with Moody.

206. Moody explained that Kolodziej would continue to work on the case, with Hagaman-Clark's assistance.

207. Upon information and belief, Moody authorized Kolodziej to work on the case "off hours."

208. The Attorney General's Office does not have policies in place to work on cases "off hours."

209. Hagaman-Clark interviewed AM with Trooper Busacca at Catholic Social Services with Mary Ortega.

210. The purpose of the interview was to get information from AM that would help establish probable cause for a search warrant.

211. The goal of the interview was to ask AM again where the alleged assaults occurred.

212. Upon information and belief, the case would not move forward without obtaining physical evidence in addition to the child's statements.

## Laura Moody's Failure to Supervise and Enabling of Kolodziej

213. As Chief of Staff for Attorney General Nessel, Moody had an obligation to supervise subordinate employees at the Department of Attorney General.

214. At all relevant times, Kolodziej was under the supervision of Moody.

215. Over the course of approximately one year, Moody arranged for Kolodziej to receive an unprecedented four pay raises.

216. In order to protect Kolodziej from being laid off, Moody arranged for Kolodziej to be promoted to a level "16" employee even though he had not earned such a promotion.

217. Moody transferred Kolodziej's work location from the Detroit office to the Lansing office of the Attorney General where she worked.

218. Moody transferred Kolodziej's supervision to be her responsibility even though it was not ordinarily the job of the Chief of Staff to supervise line prosecutors.

219. On information and belief, Moody provided Kolodziej raises, moved his work location, assigned herself as his supervisor, and allowed Kolodziej to operate without meaningful supervision or oversight to benefit a personal relationship between herself and Kolodziej.

220. Moody was either aware, or through diligent supervision, would have been aware that Kolodziej was acting in a manner which violated Sean's constitutional rights as more fully explained herein.

221. Moody failed to supervise Kolodziej to ensure that he did not violate the constitutional rights of Sean and others.

222. In the midst of Kolodziej's misconduct in Sean's case and in the case of *People of the State of Michigan v. Ian Elliott,* Moody abruptly left her employment with the Department of Attorney General.

223. On information and belief, Moody has refused to cooperate with the Attorney General's investigation into Kolodziej's misconduct.

## Kolodziej's Inappropriate Interactions with AM

224. Contrary to normal procedure, Kolodziej personally acted as the contact person between the Attorney General's Office and Johanna and AM.

225. Kolodziej met with Johanna and AM on May 1 and 16, 2019.

226. Kolodziej arranged for a Lansing Court and Capitol tour for Johanna and AM on June 4, 2019.

227. On July 2, 2019, Kolodziej met with Johanna and AM at the Attorney General's Office.

228. During that meeting, Kolodziej and AM had a squirt gun fight at the Attorney General's office.

229. On July 16, 2019, Kolodziej, Johanna, AM, and Lauren Schipani ("Schipani") went to a therapy riding stable and went horseback riding.

230. At all relevant times, Schipani was an investigator with the Attorney General's office.

231. Kolodziej, Schipani, Johanna and AM also met at the Detroit Institute of Arts on July 28, 2019 to view an armor exhibit, reportedly to show AM something about being brave.

232. Kolodziej, Schipani, and Johanna either knew or should have known that engaging in behavior such as the trip to the Detroit Institute of Arts was likely to result in AM continuing to make false allegations.

233. On September 3, 2019, Kolodziej met with Johanna and AM and sang a song to AM and gave her a book signed by Dana Nessel.

234. Kolodziej either knew or should have known that engaging in behavior such as singing songs to AM and giving her gifts was likely to result in AM continuing to make false allegations.

235. Schipani either knew or should have known that engaging in behavior such as singing songs to AM and giving her gifts was likely to result in AM continuing to make false allegations and she intentionally concealed this conduct in order to further the prosecution of Sean.

236. Schipani and Kolodziej engaged in a romantic relationship during the same time that Schipani was investigating the false allegations into Sean.

237. Kolodziej engaged in these actions to continue to elicit false information and allegations against Sean in order to benefit his personal relationships.

## Search Warrant Drafted by Kolodziej Reveals Nothing to Substantiate Johanna's False Allegations

238. On information and belief, Kolodziej drafted the factual allegations in a search warrant affidavit for the home of Larry Orr, where Sean had parenting time with AM.

239. The focus of this warrant was to search for evidence supporting Johanna's new false allegations that Sean took inappropriate photographs of AM.

240. On information and belief, at Kolodziej's request, Hagaman-Clark approved and signed the search warrant affidavit for the home of Larry Orr even though she did not have any involvement.

241. Kolodziej had Hagaman-Clark sign off on the search warrant to conceal his involvement as an investigator in the case.

242. On March 8, 2019, Trooper Busacca presented Judge Kelley Kostin with the search warrant affidavit and warrant.

243. Judge Kelley Kostin authorized a search warrant for the Orr home.

244. On March 8, 2019, the search warrant on the Orr home was executed.

245. The warrant included authorization to search the Orr home and seize all electronics.

246. Sean was at the Orr home when the warrant was executed and provided his phone and the passcode to the investigators.

247. Sean also provided the passcode to a photo gallery application on the cell phone.

248. Police did not find any evidence of any crime on the phone.

249.  The search included 8 flash drives, 2 CD-Rs, SIM card, an LG desktop computer, an Apple Mac Book Air, and a Dell laptop computer. None of the devices contained child sexually abusive material or other evidence of a crime.

250.  The police even used a canine to search for the presence of hidden electronic devices. The canine did not locate any hidden devices.

251.  Despite finding no evidence of child sexually abusive material in any of the electronic evidence seized from the Orr home, Kolodziej and Busacca continued their investigation and continued to press for criminal charges to be brought against Sean.

252.  Kolodziej drafted a Request to Initiate Litigation ("RTI") which is a form required by the Attorney General before litigation may be initiated.

253.  Kolodziej's name does not appear on the RTI.

254.  Instead, the RTI falsely indicates that it was authored by Hagaman-Clark.

255.  Kolodziej put Hagaman-Clark's name on the RTI in order to conceal his involvement in the investigation.

256.  On April 17, 2019, the RTI was sent to Chief of Staff Laura Moody.

257.  The RTI requested criminal sexual conduct charges against Sean MacMaster.

258.  AG Dana Nessel approved the RTI.

259.  On information and belief, Moody recommended to Nessel that the RTI be approved.

260.  On information and belief, Moody did not disclose the nature and scope of her relationship with Kolodziej nor his

involvement to the Attorney General when she presented the RTI to the Attorney General.

261. In presenting the RTI to AG Nessel, Moody did not disclose to the Attorney General that she knew Kolodziej to be engaging in unethical conduct which infringed on Sean's constitutional rights.

262. In presenting the RTI to AG Nessel, Moody did not disclose to the Attorney General that she knew Kolodziej had gone outside his role as an advocate and had been acting as an investigator.

263. On May 2, 2019, a warrant authorized by Hagaman-Clark charged Sean MacMaster with Criminal Sexual Conduct in the First Degree.

264. The May 2, 2019 warrant was, in part, the result of the investigative efforts of Gerald, Kolodziej, Busacca, and Schipani.

## Kolodziej Scripts Untruthful, Materially Incomplete Transcript for Busacca's Warrant Request

265. In order to obtain an arrest warrant for Sean, Michigan law requires that testimony be given under oath to support issuance of the warrant.

266. On May 7, 2019, Busacca swore to a warrant before the Honorable Marie Soma in the 52/3 Judicial District Court in Rochester Hills, Michigan.

267. On information and belief, Kolodziej wrote a script for Busacca's testimony at the swear-to hearing.

268. Busacca's testimony at the swear-to does not substantially deviate from the script drafted by Kolodziej.

269. In the script, Kolodziej purposefully left out information about AM's inconsistent statements, evidence that Johanna had coached AM to say that Sean had sexually abused her,

and evidence that Johanna had made up false accusations in order to gain an advantage in her custody battle over AM.

270. Busacca, also knowing about the evidence that Johanna had created the false accusations, intentionally left out facts that indicated that the accusations made by Johanna were false, and that Johanna had coached AM to make false accusations.

271. In the swear-to, as scripted by Kolodziej, Busacca testified that AM "described that Sean had put his salami, quote, unquote, deep inside of her."

272. Busacca did not disclose that in fact AM first claimed that it was Johanna that put salami inside of her.

273. As scripted by Kolodziej, Busacca testified that "AM was later diagnosed with chemical vulvovaginitis."

274. As scripted by Kolodziej, Busacca did not disclose that the medical exam did not reveal any evidence of sexual abuse, and that the chemical vulvovaginitis that had been diagnosed was— according to the treating doctor— normal in little girls AM's age.

275. As scripted by Kolodziej, Busacca testified that AM was interviewed at the CARE House of Oakland County by interviewers trained in forensically interviewing children.

276. As scripted by Kolodziej, Busacca testified that he viewed the video of the January 15, 2016 interview in its entirety.

277. As scripted by Kolodziej, Busacca testified that AM "made numerous credible disclosures of sexual assault during the interview."

278. As scripted by Kolodziej, Busacca did not disclose that during the interview, AM made accusations that were inconsistent, non-sensical, and fantastical.

279. As scripted by Kolodziej, Busacca testified that AM was again forensically interviewed on April 18, 2016 at the CARE House of Oakland County following additional disclosures.

280. As scripted by Kolodziej, Busacca testified that "AM made numerous credible disclosures of sexual assault during the interview."

281. As scripted by Kolodziej, Busacca did not disclose that during the second interview, AM made accusations that were in fact inconsistent, non-sensical, and fantastical.

282. As scripted by Kolodziej, Busacca testified that the case was declined by the Oakland County Prosecutor's Office "[d]espite numerous disclosures made by AM over two forensic… interviews…"

283. As scripted by Kolodziej, Busacca did not disclose that charges were declined by the Oakland County Prosecutor's Office twice.

284. As scripted by Kolodziej, Busacca did not disclose that Johanna had attempted to initiate another investigation with a different Michigan State Police post in Lapeer County, who closed the case after speaking with the OCSD.

285. As scripted by Kolodziej, Busacca did not disclose that the FBI declined to conduct an investigation after review of the OCSD file.

286. As scripted by Kolodziej, Busacca did not disclose that CPS declined the case thrice, finding that there was not a preponderance of the evidence to support that Sean was the perpetrator of sexual abuse on AM.

287. As scripted by Kolodziej, Busacca did not disclose that Johanna had a motive to make false accusations against Sean due to her desire to obtain full custody of AM.

288. As scripted by Kolodziej, Busacca did not disclose that Johanna had attempted to use the criminal and CPS investigations as leverage to attempt to get Sean to terminate his parental rights to AM.

289. As scripted by Kolodziej, Busacca did not disclose that Johanna had promised that the criminal and CPS investigations would be closed if Sean would agree to terminate his parental rights.

290. As scripted by Kolodziej, Busacca did not disclose that Johanna lied to Sean about the status of her own parental rights to AM in an attempt to convince Sean to release his parental rights to AM.

291. As scripted by Kolodziej, Busacca did not disclose that Johanna lied to Sean about CPS intending to involuntarily terminate his parental rights to AM in an attempt to convince Sean to release his parental rights to AM.

292. As scripted by Kolodziej, Busacca did not disclose that Johanna lied about Sean being relieved of child support obligations in an attempt to convince Sean to release his parental rights to AM.

293. As scripted by Kolodziej, Busacca testified regarding the Ortega sessions, stating that he "found AM's disclosures of sexual assaults to be consistent and more detailed than her previous."

294. As scripted by Kolodziej, Busacca did not disclose that the Ortegas did not use the proper forensic interview protocol for interviewing children.

295. As scripted by Kolodziej, Busacca did not disclose that during the Ortega inteviews, AM disclosed information that was not consistent with sexual abuse.

296. As scripted by Kolodziej, Busacca did not disclose that during the Ortega interviews, AM disclosed information that

was inconsistent with her prior statements, that was non-sensical and fantastical.

297. As scripted by Kolodziej, Busacca testified that during the Ortega interviews "AM described how she observed her father's snake, later explaining it was his penis, spit onto the floor…"

298. As scripted by Kolodziej, Busacca did not disclose that AM had previously discussed the snake in the April 18, 2016 forensic interview, referring to it as Sean's "pet snake", that it was green with black eyes, said "boo", had bit her, and was kept in a cage.

299. As scripted by Kolodziej, Busacca testified that he directed a search warrant at the Orr residence.

300. As scripted by Kolodziej, Busacca testified that the Michigan State Police Crime Lab "tested for bodily fluids and found a total of six semen stains in the area of the home where AM was known to play."

301. At the time of the testimony, Busacca and Kolodziej both knew that the stains were not determined to be semen.

302. Busacca and Kolodziej coordinated and agreed to present false testimony to the court concerning the suspected bodily fluids, by referring to it as semen when they knew it had not been determined to be semen.

303. As scripted by Kolodziej, Busacca testified that the six stains were tested for DNA and one stain contains the DNA of Larry Orr and the others contain the DNA of Sean.

304. As scripted by Kolodziej, Busacca testified that the "search warrant results and subsequent DNA testing fully corroborate AM's several accounts of how she observed Sean's snake, penis, spitting on the floor."

305. In truth, the search warrant findings did not corroborate any of AM's disclosures and Kolodziej and Busacca knew this fact at the time that Busacca testified otherwise.

306. Following Busacca's testimony in the swear-to, the court authorized the complaint and warrant.

307. Pursuant to the warrant, Sean was arrested by Florida authorities on the two-count Michigan felony warrant on May 7, 2019.

308. Directly following Sean's arrest, at the request of Kolodziej and Busacca, Florida Internet Crimes Against Children team executed a search warrant at Sean's residence.

309. The warrant was sought and obtained in a Florida court, and its intent was to locate any evidence of the possession or manufacture of child sexually abusive material.

310. Busacca swore to the warrant in Florida.

311. The Florida search warrant resulted in all of Sean's computers as well as his wife and children's devices being seized in Florida.

312. No evidence of a crime was discovered from the Florida devices.

**Kolodziej Conceals Involvement in the Case Initiation**

313. Busacca had drafted police reports related to his investigation of Sean.

314. Upon information and belief, Kolodziej requested a meeting with MSP personnel regarding the first paragraph of the police report authored by Busacca.

315. The meeting took place on May 3, 2019 at the MSP Metro North Post with Kolodziej, Busacca, Detective First Lietenant Robert Weimer, and Assistant Post Commander Edward Price.

316.  Upon information and belief, Kolodziej wanted to change the police report to remove reference to his involvement from the inception of the investigation.

317.  Upon information and belief, Kolodziej claimed it was because the specific grant he was working under did not allow him to work on this type of sexual assault case involving children.

318.  Kolodziej requested the alteration to conceal his involvement and attempt to avoid criminal and civil liability for his actions.

319.  Upon information and belief, Kolodziej had previously requested that Busacca change the report in this manner, but per MSP policy, reports could only be changed by approval of superiors after final submission.

320.  Upon information and belief, Kolodziej claimed that inclusion of his name in the report could affect grant funding to the Attorney General's Office.

321.  Upon information and belief, Kolodziej suggested to the members of the May 3rd meeting that Laura Moody was aware of the need for the change and supported it.

322.  On March 12, 2019, Busacca sent a letter to the judge presiding over the family law case in Florida in an attempt to help Johanna suspend Sean's parenting time.

323.  The letter sent by Busacca purports to state Busacca's opinions.

324.  In an email transmitting a copy of the letter, Busacca falsely claimed that he drafted the letter to the Florida family law judge.

325.  The letter sent by Busacca was actually authored by Kolodziej but was signed by Busacca in order to conceal Kolodziej's involvement in the investigation.

326. Busacca, Kolodziej, and Johanna MacMaster coordinated and agreed to send this letter to the Florida court in order to give Johanna an advantage in the Florida litigation.

327. At a hearing for the temporary suspension of Sean's parental rights in Florida based on the false allegations, Busacca testified that he did not review the three CPS investigations of the alleged abuse.

328. Busacca testified that he did not contact the initial investigator on the case, Detective Freiberg of the Oakland County Sheriff's Department.

329. Busacca testified that he had not read any of the Florida court transcripts nor the psychosexual evaluation of Sean.

330. Busacca testified that he did not interview the three court-appointed psychologists regarding their opinions on AM, Sean, or Johanna.

331. Busacca testified that the documents and testimony from the civil proceedings in Florida are not "specifically relevant" to his investigation.

**Sean's Arrest and Traumatic Transport to Michigan**

332. On May 7, 2019, Sean and Larry were arrested.

333. In May 2019, Sean was employed as a Lieutenant with a police department in Jacksonville, Florida.

334. Officers showed up to Sean's work to arrest him. He was taken to the Duval County Jail.

335. Because of his employment as a police officer, Sean was placed in solitary confinement.

336. The arrest made local and national news and news media in Jacksonville, Florida reported live from Sean and his wife's front lawn.

337. Sean did not fight extradition.

338. Through counsel, Sean offered to self-surrender in Michigan at his own expense.

339. Initially, he was given a $25,000 bail by the Duval County judge and told to report to Michigan in two weeks, but he was not released because of the efforts of Defendants.

340. At Larry Orr's bond hearing, the attorneys including Kolodziej falsely claimed that Sean fought extradition and they were working on a transfer date.

341. On June 8, 2019, after spending 31 days in solitary confinement following his arrest, Sean was extradited.

342. Sean spent nine days in transport by a private prison transport company.

343. The first ride was 13 hours straight to Atlanta, Georgia.

344. Sean was housed in a jail there for 22 hours.

345. In the second ride, Sean rode for 72 hours straight, where he slept confined to a cage with belly chains, handcuffed with leg chains and cuffs inside a minivan without reading materials or the ability to straighten his legs, lay down, use the restroom more than once every four hours, or stretch his arms.

346. On that second trip, Sean rode the bus through several different states before arriving back in Atlanta.

347. From Atlanta, Sean was transported in a van to Kentucky where he then spent five days in a prison before doing the last leg of the trip.

348. Upon information and belief, the ordinary practice of the Michigan State Police in a case like Sean's would have been to fly Trooper Busacca to Florida on MSP-owned aircraft and return Sean to Michigan in Trooper Busacca's custody.

349. On information and belief, Sean was not afforded the ordinary method of transportation as a means by Defendants of inflicting pain and extrajudicial punishment on him.

350. Sean was initially denied bond on arrival in Michigan.

351. From his arrival in Michigan until his ultimate release, Sean was held in solitary confinement.

352. After three and a half days of testimony over the course of several weeks and argument regarding bond, Sean was granted a $250,000 bond.

353. At the bond hearing, Kolodziej elicited untruthful testimony regarding Schipani's work experience, exaggerating her prior involvement with criminal sexual conduct and sexual assault of children cases.

354. Schipani testified to allegations made by Johanna against Sean concerning their marriage, his employment, and AM.

355. Schipani did not verify any of the allegations made by Johanna before testifying at the bond hearing.

356. Sean was denied a reasonable bond in part because Kolodziej, Busacca, and Schipani suppressed evidence favorable to Sean including the favorable evidence referenced above.

357. The family did not have the resources to pay the bond, so Sean remained in jail.

**Kolodziej Resigns and the Case is Dismissed**

358. At the same time as the case at issue, Kolodziej was prosecuting a sexual assault case out of Isabella County, Michigan involving Central Michigan University students.

359. Kolodziej abruptly resigned when it was revealed that he was having a sexual relationship with the victim in the case.

360. On September 9, 2019, Sean learned of Kolodziej's termination.

361. Sean's preliminary examination was scheduled for September 16, 2019, but due to the resignation, a new prosecutor was assigned and needed more time.

362. On October 3, 2019, the new prosecutor on the case, Robyn Liddell, moved to reopen the proofs of the bond hearing.

363. At the motion hearing, Robyn Liddell disclosed that the officer in charge, Lauren Schipani, made inaccurate and untruthful statements in her testimony at the bond hearing.

364. Robyn Liddell also disclosed that through an internal investigation, it was determined that Schipani and Kolodziej had an inappropriate relationship.

365. As a result, Schipani was removed from the case and placed on administrative leave.

366. On October 7, 2019, Sean was finally released on bond, though he remained on GPS tether.

367. Sean spent a total of 151 days wrongfully incarcerated.

368. During those 151 days, Sean was locked down in solitary confinement for 23 hours per day.

369. During those 151 days, Sean was only permitted recreation time for one hour every other week, if weather permitted.

370. On November 25, 2019, AG Dana Nessel informed Sean's defense counsel that charges against Sean and Larry were going to be dismissed, and a motion was filed in the district court in Oakland County to dismiss the charges.

371. On December 4, 2019, the charges against Sean and Larry were officially dismissed.

372. As a result of his incarceration, Sean lost his job and went without a salary from May 7, 2019 to March 2020.

373. Sean eventually received his job back but was hired back at a lower rank with substantially lower pay.

374. As a result of Johanna's false allegations, Sean has missed out on 187 days of parenting time with AM in 2019, 187 days of parenting time in 2020, and 62 days of parenting time in 2021 and counting.

## COUNT I:
## FOURTH AMENDMENT VIOLATION:
## *FRANKS* VIOLATION
## (DEFENDANTS KOLODZIEJ AND BUSACCA)

375. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

376. At all relevant times, Defendants Busacca and Kolodziej were acting within the scope of their respective employment under color of law, cloaked with the authority which was granted to them.

377. Plaintiff's constitutionally protected rights include the right to be free from unreasonable seizure by government agents, including Defendants, as provided for by the Fourth Amendment, made actionable by 42 U.S.C. §1983.

378. Defendant Kolodziej drafted a script for Defendant Busacca to use in the swear-to, including false statements and material omissions for Busacca to state under oath.

379. Defendant Kolodziej, in drafting the script, search warrant, and arrest warrant affidavits, was acting as a witness making false statements of fact.

380. Defendant Busacca, in obtaining the warrant for Plaintiff's arrest, omitted material information intending to mislead

the issuing magistrate in finding that probable cause existed in violation of Plaintiff's Fourth Amendment rights.

381. Defendant Busacca omitted material information at the suggestion and in agreement with Defendant Kolodziej.

382. Defendant Busacca, in obtaining the warrant for Plaintiff's arrest, knowingly and intentionally made false statements or acted with reckless disregard for the truth in violation of Plaintiff's Fourth Amendment rights.

383. The false and omitted information referenced above was necessary to the finding of probable cause.

384. Defendant Busacca intentionally or with reckless disregard for the truth, caused a warrant to issue by swearing to a complaint containing false statements or providing false oral testimony and omitting material information that would have vitiated probable cause.

385. Defendants could not, in good faith, rely on a judicial determination of probable cause based on their deliberate or reckless disregard for the truth and material omissions in violation of Plaintiff's Fourth Amendment rights.

386. No warrant would have issued for the arrest of Plaintiff if Defendants had not included information they knew or should have known to be false or if Defendants had not omitted information necessary to the finding of probable cause.

387. Reasonable officers should have known these rights, and therefore, Defendants are not cloaked with qualified immunity.

388. Defendant Kolodziej was functioning outside of his role as an advocate and is not entitled to absolute immunity.

389. As a direct and proximate result of Defendants' actions, Plaintiff suffered a loss of liberty, suffered humiliation, and other damages.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Defendants, jointly and severally, in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interest, costs, and attorney fees under 42 U.S.C. §1988.

### COUNT II:
### FOURTH AMENDEMENT VIOLATION:
### WARRANT LACKING PROBABLE CAUSE
### (DEFENDANTS KOLODZIEJ, BUSACCA)

390. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

391. Plaintiff's constitutionally protected rights include the right to be free from unreasonable seizure by government agents, including Defendants, as provided for by the Fourth Amendment, made actionable by 42 U.S.C. §1983.

392. Defendant Busacca lacked probable cause when obtaining the warrant for Plaintiff's arrest in violation of the Plaintiff's Fourth Amendment rights.

393. Defendant Kolodziej lacked probable cause in requesting Busacca obtain a warrant for Plaintiff's arrest in violation of Plaintiff's Fourth Amendment rights.

394. Defendant Kolodziej directed the investigation to obtain probable cause to arrest Plaintiff.

395. Defendant Kolodziej drafted the search warrants for Plaintiff's electronics and the location of the allegation.

396. In doing so, Defendant Kolodziej was searching for corroboration that might provide probable cause to arrest Plaintiff.

397. As part of the investigation, Defendant Kolodziej directed the police on how to conduct the investigation and establish probable cause.

398. Defendant Kolodziej effectively conducted the questioning of witnesses by drafting questions that he wanted Defendant Schipani to ask and provided her a document with the written questions.

399. Defendant Kolodziej drafted the arrest warrant for Plaintiff and Busacca swore to it.

400. Defendant Kolodziej wrote Busacca a script for what testimony he was to provide when swearing to the warrants.

401. The scripted testimony of Busacca omitted exculpatory evidence.

402. The scripted testimony of Busacca was dishonest or in reckless disregard of the truth.

403. In drafting the warrants and scripting the testimony of Busacca, Defendant Kolodziej made false statements of fact in support.

404. Defendant Kolodziej used Busacca to circumvent his ethical obligation to not act as advocate and witness in the same proceeding.

405. Defendants could not, in good faith, rely upon the warrant in this case because the warrant application was so lacking in indicia of probable cause as to render official belief in its existence unreasonable.

406. Reasonable officers should have known these rights, and therefore, Defendant Busacca is not cloaked with qualified immunity.

407. In preparation of the case for Plaintiff, Defendant Kolodziej functioned as an investigator, directing the investigation,

searching for corroboration by warrants, and acting outside of his role as advocate.

408. In drafting the affidavit and scripting the swear to, Defendant Kolodziej was performing the function of a witness.

409. Where a prosecutor functions as an investigator or witness rather than an advocate, he is not entitled to absolute immunity.

410. Reasonable investigators should have known these rights, and therefore, Defendant Kolodziej is not cloaked with qualified immunity.

411. As a direct and proximate result of Defendants' actions, Plaintiff suffered a loss of his liberty, suffered humiliation, and other damages.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Defendants, jointly and severally, in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interest, costs, and attorney fees under 42 U.S.C. §1988.

**COUNT III:**
**FOURTH AMENDMENT VIOLATION:**
**PROSECUTION WITHOUT PROBABLE CAUSE /**
**FEDERAL MALICIOUS PROSECUTION**
**(DEFENDANTS KOLODZIEJ, BUSACCA, GERALD,**
**SCHIPANI, MACMASTER)**

412. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

413. Defendants Gerald, Busacca, Kolodziej, Schipani, and MacMaster intentionally and maliciously instituted criminal charges for Plaintiff without probable cause, by requesting a warrant without probable cause which contained false information and omitted relevant and material information.

414. Defendants Gerald, Busacca, Kolodziej, Schipani, and MacMaster made, influenced, or participated in the decision to prosecute without probable cause in violation of Plaintiff's Fourth Amendment rights.

415. The criminal case against Plaintiff was dismissed, resulting in termination of the charge in Plaintiff's favor.

416. As more fully outlined herein, Defendant Kolodziej was acting outside of his role as an advocate and is not entitled to absolute immunity.

417. Defendants Gerald, Busacca, Kolodziej, Schipani, and MacMaster acted with reckless disregard of the law and the legal rights of Plaintiff in causing a criminal proceeding to begin.

418. Plaintiff was subjected to humiliation, fear, arrest and detention against his will, criminal charges, and pain and suffering by the illegal acts of Defendants.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Defendants, jointly and severally, in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interests, costs, and attorney fees under 42 USC §1988.

## COUNT IV:
## SUPERVISORY LIABILITY / FAILURE TO TRAIN OR SUPERVISE
## (DEFENDANT MOODY)

419. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

420. Defendant Laura Moody, Chief of Staff, hereinafter "Supervisory Defendant" failed to adequately supervise Defendant Kolodziej regarding the investigation and prosecution pursuant to the Fourth Amendment of the United States.

421. Defendant Moody was responsible for the administration of policies, procedures, and personnel of the Attorney General's Office.

422. The Supervisory Defendant was deliberately indifferent to the need to adequately supervise Defendant Kolodziej.

423. The Supervisory Defendant was grossly negligent in managing subordinates who caused the unlawful condition or event described herein.

424. The failure by the Supervisory Defendant can fairly be said to represent a policy for which she is liable for the resulting harm to Plaintiff.

425. Supervisory Defendant knew or in the exercise of reasonable diligence should have known that the conduct of Defendant Kolodziej was likely to occur in the absence of proper supervision.

426. Supervisory Defendant approved, authorized, condoned, and acquiesced in the decisions and acts of Defendants Kolodziej and Busacca in pursuing prosecution against Plaintiff.

427. The Supervisory Defendant failed to take any effective preventative or remedial measures to guard against the conduct of Defendant Kolodziej more fully set forth herein.

428. Sdupervisory Defendant submitted four salary increases for Kolodziej that were unprecedented and extraordinary in frequency and were not based on articulable facts or merits.

429. The Supervisory Defendant engaged in unprecedented actions to protect Kolodziej from a potential layoff by increasing his pay grade.

430. The Supervisory Defendant was aware of Kolodziej's unconventional meetings with victims and witnesses outside of the office and normal business hours and did nothing in response.

431. Had the Supervisory Defendant taken preventative or remedial measures, Plaintiff would not have suffered the deprivation of his rights fully set forth herein. The failure amounted to deliberate indifference, or deliberate misconduct, which directly caused the deprivations suffered by Plaintiff.

432. Supervisory Defendant failed to supervise Defendant Kolodziej and said failure caused Plaintiff's damages.

433. Supervisory Defendant either knew or should have known that the other Defendants were likely to engage in conspiratorial wrongs against Plaintiff and Supervisory Defendants had the power to prevent or to aid in preventing the commission of those wrongs but neglected to do so. These wrongful acts could have been prevented by the exercise of reasonable diligence by Supervisory Defendant.

434. As a direct and proximate result of the aforedescribed unlawful and malicious acts of Supervisory Defendant, Plaintiff was deprived of his right to be secure in his home

and person, against unlawful and unreasonable seizure of his person, to equal protection of the laws, and to Due Process of Law, in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

435. As a direct and proximate result of Defendant's actions, Plaintiff suffered a loss of liberty, suffered humiliation, and other damages.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Supervisory Defendant in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interest, costs, and attorney fees under 42 U.S.C. §1988.

## COUNT V:
## CIVIL CONSPIRACY TO PROSECUTE
## WITHOUT PROBABLE CAUSE
## (DEFENDANTS KOLODZIEJ, BUSACCA, GERALD, SCHIPANI, MACMASTER)

436. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

437. Defendants Kolodziej, Gerald, Busacca, and Schipani acted in concert with Defendant Johanna MacMaster to accomplish the unlawful prosecution of Plaintiff without probable cause.

438. Defendants acted together to prosecute Plaintiff for alleged crimes for which Defendants knew or had reason to know were without probable cause.

439.   Defendants participated in making untruthful statements and material omissions to the court in an effort to secure warrants.

440.   Defendants encouraged, assisted, and ratified Defendant Johanna MacMaster's unlawful objective to falsely accuse Plaintiff of sexual abuse in order to gain an advantage in the custody dispute following divorce from Plaintiff.

441.   Defendant Kolodziej was acting outside of his role as advocate and is not entitled to absolute immunity.

436.   As a direct and proximate result of the aforedescribed unlawful and malicious acts of Defendants, Plaintiff was deprived of his right to be secure in his home and person, against unlawful and unreasonable seizure of his person, to equal protection of the laws, and to Due Process of Law, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

437.   As a direct and proximate result of Defendants' actions, Plaintiff suffered a loss of liberty, suffered humiliation, and other damages.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Defendants, jointly and severally in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interest, costs, and attorney fees under 42 U.S.C. §1988.

## COUNT VI:
## 14TH AMENDMENT PRETRIAL DETENTION CLAIM /
## EXTRAJUDICIAL PUNISHMENT
## (DEFENDANT KOLODZIEJ)

438. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

439. Plaintiff's constitutionally protected rights include the right to be free from the use of excessive force and extrajudicial punishment against him by government agents, including Defendants, while in pretrial detention as provided for by the Fourteenth Amendment, made actionable by 42 U.S.C. §1983.

440. Being subjected to being locked in a cage for 72 hours while being transported to Michigan as a form of punishment when standard protocol called for air transport was not rationally related to a legitimate governmental objective or it was excessive in relation to that purpose.

441. Defendant Kolodziej repeatedly lied that Plaintiff was opposing extradition, resulting in Plaintiff's unnecessary transport to Michigan.

442. At the time that Kolodziej arranged for Plaintiff's unnecessary transport to Michigan, Kolodziej was aware that there was not probable cause to believe Plaintiff had committed a crime.

443. The excessive force used on Plaintiff was a deliberate act intended to chastise or deter and imposed for the purpose of punishment.

444. The amount of force used was not objectively reasonable.

445. The amount of force used did not stem from a legitimate interest of the government to manage the facility in which Plaintiff was detained.

446.  The amount of force used was not necessary to preserve internal order and discipline or to maintain institutional security.

447.  Defendant's actions shocked the conscience as they were deliberately indifferent to Plaintiff's federally protected rights after a reasonable opportunity to deliberate.

448.  The right to be free from excessive force as a pretrial detainee is clearly established.

449.  Reasonable government actors should have known of these rights, and therefore, Defendant is not cloaked with qualified immunity.

450.  Defendant Kolodziej was acting outside of his role as advocate and is not entitled to absolute immunity.

451.  As a direct and proximate result of Defendant's actions, Plaintiff suffered a loss of his liberty, experienced pain and suffering, suffered humiliation, and other damages.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Defendants, jointly and severally in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interest, costs, and attorney fees under 42 U.S.C. §1988.

## COUNT VII:
## STATE LAW MALICIOUS PROSECUTION
## (DEFENDANT MACMASTER)

452.  Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

453. Defendant MacMaster made and perpetuated false allegations and willfully concealed facts, causing a criminal investigation and prosecution to be instituted against Plaintiff.

454. Defendant MacMaster brought action against Plaintiff without probable cause.

455. Defendant MacMaster pursued these actions knowing the allegations were inconsistent, without corroboration, and had been tainted by improper means.

456. Defendant MacMaster brought action against Plaintiff with malice.

457. Defendant MacMaster brought action against Plaintiff based on her personal animus and to gain advantage in the custody dispute.

458. The proceedings were terminated in Plaintiff's favor upon dismissal of the criminal case against Plaintiff.

459. As a result of the acts of Defendant MacMaster, Plaintiff has suffered embarrassment and impairment of his reputation; was deprived of his employment and seniority rights; his liberty; and was obliged to spend large sums of money for his defense in the proceeding.

460. Plaintiff is entitled to treble damages pursuant to MCL 600.2907 for his injuries.

**WHEREFORE**, Plaintiff demands judgment against Defendant for whatever amount to which he is entitled, together with the costs of this action.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable in this case.

Respectfully submitted,

Dated: May 6, 2021

<u>/s/ Joshua A. Blanchard</u>
Joshua Blanchard
Keeley D. Blanchard
Melissa C. Freeman
**BLANCHARD LAW**
Attorneys for Plaintiff
309 S. Lafayette St., Ste 208
PO Box 938
Greenville, MI 48838
(616) 773-2945
josh@blanchard.law