UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEAN MACMASTER,

               Plaintiff,

v.

DAVID BUSACCA, et al.,

               Defendants.

_____/

Case No. 2:21-cv-11052

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER DENYING
MOTION FOR SUMMARY JUDGMENT [108]**

The State of Michigan arrested and incarcerated Sean MacMaster after his ex-wife accused him of abusing their minor daughter, AM. Although a Florida court previously determined that the allegations lacked credibility, there was no medical confirmation of abuse, and AM admitted to lying about the abuse, Michigan moved forward with Plaintiff's prosecution. But after it emerged that misconduct by a prosecutor involved in the case had occurred, Michigan dropped all charges. Sean MacMaster then sued his ex-wife, Johanna MacMaster; the disbarred prosecutor, Brian Kolodziej; and State Trooper David Busacca, for several constitutional violations. ECF 1; ECF 53.[1] Busacca, along with his co-defendants, each moved for

---

[1]Plaintiff's initial complaint also named Lauren Schipani, Laura Moody, and Detective Michael Gerald as defendants. ECF 1, PgID 1. But they are no longer part of the case. *See* ECF 68 (dismissing Schipani); ECF 84 (dismissing Moody); ECF 119 (granting Gerald's motion for summary judgment).

summary judgment. *See, e.g.*, ECF 102, 108, 109, 110. For the reasons below, the Court will deny Bussaca's motion.

## BACKGROUND[2]

### I.    Initial Allegations

Plaintiff Sean MacMaster was formerly married to Defendant Johanna MacMaster. ECF 53, PgID 789. The two have a young daughter, "AM." *Id.* Sean and Johanna divorced in 2012, *id.*, following allegations of infidelity, *see* ECF 113-1, PgID 4688. After the divorce, Sean—who lives in Florida—flew to Michigan every other weekend to have parenting time with AM. ECF 112-4, PgID 4481; ECF 53, PgID 789. His parenting time took place at the home of his stepfather Larry Orr in Oxford, Michigan. ECF 112-1, PgID 4438.

Since their divorce, Sean and Johanna MacMaster have been engaged in a custody dispute over AM, during which Johanna accused her ex-husband and Larry Orr of sexually abusing AM. ECF 53, PgID 781; *see generally* EFC 112-3. Johanna brought her allegations to various law enforcement agencies, including the Oakland County Sheriff's Department, the Oakland County Prosecutor's Office, and Child Protective Services (CPS). All three agencies investigated the allegations and twice found no evidence of sexual abuse. ECF 112-5, PgID 4503; *see also* ECF 112-3, PgID

---

[2] In the interest of judicial economy, the Court borrows parts of the background from its prior order. *See* ECF 118. The parties are also reminded that Rules 1(m)(2), 5(c), and 19(a) of the Court's Electronic Filing Policies and Procedures (available as an appendix to the Local Civil Rules) require that all electronic PDF filings (including attachments) be text-searchable whenever possible. Failure to comply with the Local Rules will result in the striking of filings.

2

4468; ECF 112-6, PgID 4509; ECF 112-8, PgID 4519; ECF 107-2, PgID 2226–27 (Plaintiff's polygraphs). Johanna also brought her allegations to the Michigan State Police (MSP) and the Federal Bureau of Investigation. ECF 53, PgID 785. Both declined to pursue an investigation. *Id.*; ECF 112-5, PgID 4503.

In January 2016, in a recorded conversation at a McDonald's in Florida, Johanna suggested that she would drop her accusations if Sean signed away his parental rights and even presented a document for him to sign to that effect. ECF 112-5, PgID 4501 (Johanna MacMaster telling Sean that giving up his parental rights was a "gift" and was "his get-out-of-jail-free card."); ECF 112-3, PgID 4467; ECF 107-1, PgID 2210–12 (Johanna MacMaster's drafted document). Sean, however, refused to sign the document. *Id.* Johanna also admitted that she did not believe Sean ever abused their daughter. ECF 113-1, PgID 4678.

After a seven-day hearing in December 2016, ECF 113-9, PgID 4772, the Florida State court presiding over the custody dispute concluded that AM's statements about the alleged abuse were insufficiently trustworthy because of inconsistency in AM's statements, "the marital discord between the parties," and the repeated decisions by multiple law enforcement agencies not to pursue Johanna MacMaster's allegations. ECF 112-3, PgID 4472; *id.* at 4463–68. In a detailed order, dated February 27, 2017, the court also noted that "there was no medical confirmation of sexual abuse," even though AM met with three doctors after the allegations. *Id.* at 4468, 4477. Accordingly, the court ordered AM to meet with a therapist to prepare for time-sharing with her father, including overnights. *Id.* at 4474, 4476. Later, on

January 10, 2018, a court-appointed therapist testified that AM admitted to lying about the abuse. *See* ECF 113-8, PgID 4757, 4759. ("No, that's a lie. Daddy never hurt me. Daddy never hurt me.").

II.   The Investigation

Johanna MacMaster met Brian Kolodziej before April 2018. ECF 113-9, PgID 4765. At the time, Kolodziej was a prosecutor in Macomb County. *Id.* He was also in a romantic relationship with Johanna's cousin, Victoria Schulte, who worked with Kolodziej as an office assistant at the Macomb County Prosecutor's Office. ECF 112-2, PgID 4457–58. Kolodziej met with Johanna and agreed to investigate the alleged sexual abuse, despite the fact it occurred in Oakland County—outside of his jurisdiction as a Macomb County prosecutor. ECF 112-1, PgID 4436. Kolodziej recruited his "drinking budd[y]" Gerald, a detective for the Center Line Police Department in Macomb County, to help with the investigation. *Id.*; ECF 112-7, PgID 4513; ECF 111-5, Page 14. Gerald agreed because he knew Kolodziej was "[m]adly in love" and "trying to show off for [Schulte]." ECF 112-8, PgID 4521–22.

In August 2018, Johanna brought AM to therapeutic sessions with Robert and Mary Ortega at the Family Assessment Clinic, where AM reiterated the years-old abuse allegations that she had previously denied. *See* ECF 110-7, PgID 3812, 3820 (transcripts of interviews with Ortegas); ECF 111-1, Page 129 (discussing interviews with the Ortegas).

Then, in September 2018, Kolodziej became an Assistant Attorney General for the State of Michigan; his primary responsibility was prosecuting sexual assault

4

cases involving adult victims. Schulte broke up with Kolodziej soon after he started the new job. ECF 112-7, PgID 4512. The same week as the breakup—and after not pursuing a case against Plaintiff for several months—Kolodziej began moving the case forward. But because the case was outside the purview of Kolodziej's new job, Kolodziej's supervisor designated another Assistant Attorney General, Danielle Hagaman-Clark, as the signatory on the case. ECF 112-21, PgID 4590. Although he was no longer assigned to the case, Kolodziej contacted Defendant Busacca, a young Michigan State Police trooper who had no experience with sexual assault cases and had never sworn out a felony arrest warrant, to help with the investigation. ECF 112-1, PgID 4437; ECF 112-5, PgID 4486–87; ECF 111-1, Page 43.  Gerald then met with Busacca to give him the evidence he had compiled up to that point. ECF 112-13, PgID 4547.

Busacca first met Kolodziej in 2015 or 2016, and they developed "somewhat of a friendship." ECF 111-9, Pages 6–7. Although Busacca mostly knew Kolodziej from his work as a prosecutor, he also hung out with Kolodziej at the local cigar lounge, where Busacca went about once a week. *Id.* But the *MacMaster* case worried Busacca. It was more complex than anything he had previously handled, ECF 111-1, Page 59, and he was concerned that other agencies, especially in Oakland County, had already investigated the case. *Id.* at 90, 119. Despite his hesitations, and despite knowing that an employee at the Macomb County Prosecutor's Office was a cousin of Johanna MacMaster, *id.* at 90, 92, Busacca went ahead.

Around November 2018, Busacca read over two hundred pages about the case, including psychologist reports, polygraph reports, family court proceedings, and medical reports. *Id.* at 127–28. Although he testified that he reviewed the documents "thoroughly," Busacca also recalled "skipping through the family court stuff at a certain point because it was pretty long." *Id.* at 128. On the one hand, Busacca admitted that the "back and forth between mom and dad" made the case complicated. *Id.* On the other hand, Busacca also claimed that he thought the family court documents were only "[p]eripherally" relevant to his investigation. ECF 111-1, Page 224. Still, Busacca admitted to reading the family court documents as part of his investigation. *See* ECF 111-1, Pages 127–28, 224. And he admitted to listening to the McDonald's recording. ECF 111-1, Pages 196–201.

Around March 7, 2019, Kolodziej drafted a search warrant affidavit for the Orr home in Oxford, Michigan. ECF 112-25, PgID 4618–21 (search warrant affidavit); *see also* ECF 112-1, PgID 4438 (testimony about an email from Busacca to Kolodziej showing a copy of the search warrant affidavit and explaining that it is "exactly the same as the version you sent me with the addition of a few small formatting and word changes"); ECF 112-16, PgID 4563 (Busacca testifying that Kolodziej "wrote the majority of" the search warrant affidavit). Busacca appeared before Oakland County District Court Judge Kelley Kostin and swore out the warrant.

Because Busacca conceded that he reviewed the family court documents and the McDonald's recording, he likely knew of at least eight types of possibly exculpatory information at the time he signed the search warrant affidavit. And it is

uncontested that Busacca omitted the following exculpatory information from his affidavit:

First, Busacca omitted testimony from a court-appointed reunification therapist that AM lied about the abuse.[3] In the first therapy session, AM admitted that she lied and said, "Daddy never hurt me. Daddy never hurt me." ECF 113-8, PgID 4759. AM tried to tell her mom, Johanna MacMaster, but to no avail: "I tried telling my mom, I said daddy didn't hurt me, and she said yes, he did." *Id.* at 4760. AM's mom also threatened, "If you tell people that nobody hurt you, I will have to go away, because people will think I told you to say it." *Id.* Busacca, despite reviewing the family court documents, did not tell Judge Kostin that AM lied about the abuse allegations. *See* ECF 111-17.

Second, Busacca omitted testimony from a court-appointed expert who found that AM's allegations of abuse made at the Oakland County CARE House were unreliable. ECF 111-22, Page 57. The expert told the Court: "you cannot place any weight of reliable confidence in the content of that information because of the passage of time, because of the recurring exposures to post-event information, that is

---

[3] The Court is aware minors do not always recognize that sexual contact with adults is abusive. And so, on its own, the phrase "Daddy never hurt me" might not be synonymous with "Daddy never abused me." Here, however, context suggests that sexual abuse was encompassed within AM's usage of the word hurt. At first, AM said that she stopped seeing her dad "because he hurt me." ECF 113-8, PgID 4759. Then, after a brief pause, she admitted, "No, that's a lie. Daddy never hurt me. Daddy never hurt me." *Id.* AM then explained how her mom pressured her into not admitting that nobody hurt her. *See id.* at 4760. The entirety of Dr. Stulberg's testimony therefore suggests that AM admitted to lying about the abuse, especially drawing reasonable inferences "in the light most favorable to the non-moving party." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

otherwise known as taint." ECF 111-22, Page 57; *see also* ECF 113-6, PgID 4736 (excerpt from expert's report). And yet, in the search warrant application, Busacca nevertheless relied heavily on the allegations from the CARE House interviews without any mention of indicia of unreliability. *See* ECF 111-17, PgID 4355 (detailing CARE House allegations).

Third, Busacca omitted any reference to a detailed court order concluding that AM's abuse allegations were so unreliable that they were inadmissible as evidence. In February 2017, Circuit Judge James P. Nilon found that there was "insufficient corroborating evidence to support the child's hearsay statement[s]" regarding sexual abuse. ECF 113-7, PgID 4750. Accordingly, he found that "the child hearsay statements are inadmissible because they lack sufficient trustworthiness, particularly in a contentious family law and divorce context." *Id.* Still, taking the evidence in the non-movant's favor, Busacca relied in the search warrant application on the allegations that he knew had been found unreliable. *See* ECF 111-17, PgID 4355.

Fourth, Busacca omitted any reference to the previous investigations into the alleged abuse. The Florida court summarized the results of those investigations as follows. Michigan Child Protection Services investigated but found "insufficient evidence" of sexual abuse. ECF 113-7, PgID 4746. The Oakland County Sheriff's Office investigated, found serious "red flags" with the abuse allegations, and—along

with the Oakland County Prosecutor's Office—declined to take any further action.[4] *Id.* at 4745–46; *see also* ECF 107-2 (noting that Oakland County's investigation found "no evidence to support the allegations"). Finally, although three doctors examined AM, there was "no medical confirmation of sexual abuse." ECF 113-7, PgID 4746.[5] And yet, in the search warrant affidavit, Busacca made no mention of the previous investigations. *See* ECF 111-17, PgID 4355.

Fifth, Busacca omitted evidence suggesting that Johanna MacMaster made the abuse allegations to gain leverage in her custody battle with her ex-husband. In the McDonald's recording, Johanna suggested that she would drop the allegations if Sean signed away his parental rights and even presented a document for him to sign to that effect. *See generally* ECF 113-1 (transcript of recording). She also told Plaintiff that terminating his parental rights was his "get-out-of-jail-free card." *Id.* at 4692. And she tried to use the cost of legal fees as leverage. *See, e.g.*, *id.* at 4686.

Busacca found the recording concerning, and he shared his worries with Gerald. *See* ECF 10, Page 14 (Busacca testifying that he and Gerald had "a mutual agreement that [they] both felt uneasy about some of Johanna's actions."). In fact, Busacca was so concerned about the recording that he brought it to the attention of the Michigan Attorney General's Office at a meeting on January 23, 2019. *See* ECF

---

[4] After reviewing AM's allegations, the Oakland County Prosecutor's Office could not "ascertain on any level if this [was] even sexual." ECF 113-4, PgID 4730.

[5] Of course, not all child abuse leaves physical injuries. Here, however, Sean MacMaster and Larry Orr allegedly penetrated AM's vagina on multiple occasions with chess pieces, namely the queen piece. *See* ECF 110-11, PgID 4103; ECF 110-7, PgID 3830; ECF 110-2, PgID 3655–56.

103-21. During his deposition, Busacca agreed that the recording "doesn't look good" and that it appeared to show "a motive." ECF 111-1, Page 199. But despite admitting that the recording was troubling, he never disclosed it to the court. *See* ECF 111-17.

Sixth, Busacca omitted contradictory details about the abuse itself. For instance, the affidavit claimed that AM said that Plaintiff put salami in her butt, but it omitted AM's later statement that she did not know what salami was and that her mother, Johanna MacMaster, was the one who put salami in her butt. ECF 112-3, PgID 4464. The affidavit also claimed that AM said that Plaintiff used his fingers to penetrate her anus, but it omitted her later statement that Plaintiff was trying to treat her rash. ECF 107-8, PgID 2335. Finally, the affidavit claimed that AM said that Plaintiff used scissors to look at her butt, but it did not include AM's subsequent tangents about frogs in her butt. *See id.*

Seventh, Busacca omitted direct evidence that suggested that Sean MacMaster never took nude photographs of AM. *See* ECF 111-17, PgID 4356. Specifically, on January 15, 2016, in the forensic CARE House interview, AM denied that anyone had ever taken photographs of her without her clothes on. ECF 110-4, PgID 3705, 3747–48. Years later, in the interview with the Ortegas, AM contradicted her CARE House interview. *See* ECF 110-7, PgID 3896–900. Busacca omitted any mention of AM's initial denial, *see* ECF 111-17, PgID 4355, even though it occurred closer in time to the alleged abuse. ECF 110-12, PgID 4108. Instead Busacca included in the warrant application only those facts suggesting that Sean MacMaster had taken photographs. *See* ECF 111-17, PgID 4356.

10

Eighth, Busacca omitted evidence suggestive of coaching and contamination by Johanna MacMaster. AM made statements at the CARE House that might have suggested that she had been coached on what to say. *See, e.g.*, ECF 107-2, PgID 2225 (noting that Johanna promised to give AM a prize for doing the interview).[6] The doctor who saw AM two days after the initial allegations of abuse also opined that Johanna's actions had "led to the contamination of the child's future statements." ECF 113-7, PgID 4741–42; *see also* ECF 111-22, PgID 4392 (court-appointed expert testifying about taint).

Finally, in addition to the eight omissions, Busacca falsely characterized the interview with the Ortegas as a forensic interview. *Compare* ECF 111-17, PgID 4355, *with* ECF 113-9, PgID 4765.

Based on the information in the affidavit, Judge Kostin issued the search warrant. *See* ECF 112-26, PgID 4623. But she later stated that she "would not have" issued the warrant had she known that the Oakland County Sheriff's Office, Oakland County Prosecutor's Office, and Child Protective Services declined to pursue charges against Plaintiff; that Johanna tried to use the threat of prosecution to get her ex-husband to give up his parental rights; or that the interviews with the Ortegas were not forensic interviews. ECF 111-20, Pages 1–2.

The search was executed on March 9, 2019. ECF 53, PgID 805; ECF 107-2, PgID 2261. According to Sean MacMaster, during the search the police handcuffed

---

[6] To be sure, another framing of the evidence is of a mother rewarding her child for dealing with a tough task—being honest about abuse. Omitting it, however, prevented the judge from making any possible exculpatory inference.

11

him and his stepfather, held them at gunpoint, swabbed his cheek for DNA, and searched the house. ECF 53, PgID 793. Although the search revealed no child sexual abuse materials, investigators tested stained portions of carpet from the basement. *See* ECF 110-9, PgID 4084. "Sean MacMaster appeared to be staying in the basement living area of the home. A mattress with blankets and pillows was found on the floor of the basement living area, and all of Sean MacMaster's personal items were located on a small table next to the mattress." ECF 110-2, PgID 3678. Moreover, MacMaster had prepared a different room in the basement as a bedroom for AM. ECF 110-9 PgID 4085. The carpet tests "[i]ndicated the possible presence of seminal fluid; however, sperm cells were not confirmed." *Id.* at 4087.

Investigators also tested two portions of the carpet for DNA. First, they collected a section of carpet, labeled L4, from underneath the bed in the basement room prepared for AM. *Id.* at 4085. Subsequent tests found Larry Orr's DNA on L4, but they were "uninformative" with respect to Sean MacMaster. *Id.* at 4090. Second, investigators collected a carpet swab of a stain, labeled L5, in front of the entertainment center in Sean MacMaster's basement bedroom. *Id.* at 4085. Subsequent tests found Sean MacMaster's DNA on L5, but not Larry Orr's. *Id.* at 4091.

The search and the testing occurred more than three years after the alleged abuse. *See* ECF 110-12, PgID 4108 (alleging that the abuse occurred between July 16, 2011 and January 11, 2016).

12

After the search of the Orr home, Busacca altered a months-old police report to hide Kolodziej's involvement in the case. *See* ECF 111-9, Page 37–38; ECF 102-14, PgID 1925 (providing date of meeting). At Kolodziej's request, Busacca removed the prosecutor's name from the report, removed references to the Macomb County Prosecutor's Office, and removed the fact that Detective Gerald had agreed to review the initial complaint "as a favor." *See id.*; ECF 102-14, PgID 1932–33 (original and altered reports). Busacca's supervisor testified that Kolodziej's name should not have been removed from the incident report. ECF 111-11, Page 36 (suggesting that Busacca violated Michigan State Police policy by changing the report); *see* ECF 102-14, PgID 1925 (requiring supervisor approval before making changes to reports).[7]

Days after altering the police report, on May 7, 2019, Busacca swore out an arrest warrant for Sean MacMaster before Judge Marie Soma. ECF 111-18 (swear-to in support of arrest warrant). With the exception of references to the involvement of the Oakland County Prosecutor's Office and reunification therapy, Busacca omitted the same eight pieces of exculpatory information from the arrest warrant that he omitted from the search warrant. *See generally id.* He also, once again, falsely characterized the interviews with the Ortegas as forensic interviews. *See id.* at 7–8.

Busacca also swore that the crime lab found "a total of six semen stains in the area of the home where AM was known to play," and linked the stains to Sean and

---

[7] Previously, Kolodziej had asked Busacca not to mention his name when he testified about the case. ECF 111-9, Page 83. Busacca agreed. *Id.* And so, on March 25, 2019, when Busacca testified in a Florida proceeding, he hid Kolodziej's involvement from the court. ECF 111-16, Page 17.

13

Larry. ECF 110-11, PgID 4104. But he did not tell the Judge that L4 and L5 were taken from different bedrooms in the basement. *See* ECF 111-18, Page 8. He did not tell the Judge that the alleged abuse involving ejaculation at the Orr home was said to have occurred in the bathroom. *See id.*; *see also* ECF 110-3, PgID 3700 (noting that "all the times" Dad's "snake spit" [possibly ejaculation] "happened in the bathroom on the floor"). And Busacca did not tell the Judge that L5 was from the room where Sean MacMaster was staying. *See* ECF 111-18, Page 8.

Finally, Busacca falsely swore that the search warrant results and tests "fully corroborate[d] AM's several accounts of how she observed Sean's snake, penis, spitting on the floor." ECF 111-18, Page 8. For context, AM had previously noted that the snake was "green with black eyes," said "boo," and lived "in a cage," ECF 111-1, Pages 191–92; *see also* ECF 110-2, PgID 3646.

Based on the information in the warrant, Sean MacMaster was arrested and spent several months in jail.

In September 2019, Kolodziej abruptly resigned from the Attorney General's Office for having a sexual relationship with a victim in a different sexual assault case. *See generally* ECF 103-13, Pages 3–4.[8] After Kolodziej's resignation, a new prosecutor

---

[8] The Attorney Discipline Board ultimately disbarred Kolodziej. State of Michigan Attorney Disciplinary Board, Notice of Disbarment, Brian J. Kolodziej, Case No. 21-56-JC (Dec. 15, 2021) [https://perma.cc/4CN7-6A9U]. Special Agent Karen Fairley, who worked with Kolodziej on *People v. Ian Elliott*, Case No. 19-165-FY, testified that Kolodziej repeatedly interviewed witnesses without her, instructed her to testify to things she knew were false, changed her reports, and more. *See* ECF 112-28. Fairley also testified that Kolodziej asked her to arrest the defendant in the *Elliott* case at the courthouse—without informing the defense attorney—in an attempt to impress the victims, one of whom was in a romantic relationship with Kolodziej. *Id.* at 4635–

was assigned to the criminal case. And on December 19, 2019, Michigan dropped all charges against Sean MacMaster because of an "internal investigation." ECF 110-13, PgID 4117. By that time, according to the complaint, Sean had spent 151 days in solitary confinement, lost his job, and missed hundreds of days of parenting time with AM. ECF 53, Page 43.

    III.    Procedural Background

    In 2021, Plaintiff Sean MacMaster sued Defendants under 42 U.S.C. § 1983 and alleged that Defendants violated Plaintiff's Fourth Amendment rights and certain State laws. ECF 1. Kolodziej moved to dismiss the complaint and argued that he had immunity. ECF 16. The Court granted Kolodziej's motion in part and ruled that he was entitled to absolute immunity as to an arrest warrant he obtained in the criminal case, but not a search warrant. EFC 51, PgID 760. In the same order, the Court granted Plaintiff leave to file an amended complaint. *Id.* at 773.

    Plaintiff filed an amended complaint soon after. ECF 53. In the amended complaint, Plaintiff alleged that Busacca violated his Fourth Amendment rights when he swore to a warrant that contained false statements and that Kolodziej violated Plaintiff's Fourth Amendment rights when he drafted the affidavit to which

───────────────

36. As the Court previously detailed, Kolodziej's actions in the *MacMaster* case also raised questions. *See* ECF 118, PgID 4897. Kolodziej had a squirt gun fight with AM in the Attorney General's office, he attended church and prayed the rosary with Johanna MacMaster's grandmother, he gave AM a book signed by the Michigan Attorney General, he played AM her favorite song on the guitar, he took AM horseback riding on her birthday, and he took AM to the Detroit Institute of Art with her mother and Special Agent Lauren Schipani, with whom Kolodziej also had a brief romantic relationship. *See id.*

15

Busacca swore. *Id.* at 819. Plaintiff also alleged that Kolodziej and Busacca violated his Fourth Amendment rights because they lacked probable cause to obtain an arrest warrant. *Id.* at 820–23.[9] And Plaintiff alleged that Kolodziej, Busacca, Gerald, and Johanna MacMaster violated his Fourth Amendment rights through malicious prosecution and civil conspiracy. *Id.* at 823–25. Plaintiff then alleged that Kolodziej violated his Fourteenth Amendment right to protection against extrajudicial punishment while in pretrial detention. *Id.* at 826. Last, Plaintiff alleged a state-law malicious prosecution claim against Johanna MacMaster. *Id.* at 827–28.

Defendants Kolodziej, Busacca, Gerald, and Johanna MacMaster each moved for summary judgment. ECF 102, 108–10. The Court granted in part and denied in part Kolodziej's motion. ECF 118. And it granted Gerald's motion. ECF 119.

## LEGAL STANDARD

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party must point to specific portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party may not simply rest on the pleadings but must present "specific facts showing that there is a genuine issue for

---

[9] The Court already ruled that Kolodziej has immunity as it pertains to the arrest warrant. ECF 51, PgID 760. The Court also dismissed a separate claim against Kolodziej for violating Plaintiff's right to protection against extrajudicial punishment while in pretrial detention. ECF 118, PgID 4915.

trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)).

A fact is material if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When it considers a motion for summary judgment, the Court must view the facts and draw all reasonable inferences "in the light most favorable to the non-moving party." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

## DISCUSSION

I. <u>Qualified Immunity</u>

In his motion for summary judgment, Busacca invoked qualified immunity as a defense to Plaintiff's Fourth Amendment and malicious-prosecution claims. *See* ECF 108, PgID 2550–51. "Qualified immunity is an affirmative defense" to a § 1983 claim. *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994) (citation omitted). It "'shield[s]' public officials from money-damages liability if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Once a defendant asserts qualified immunity, "Plaintiff bears the burden of showing that [the] defendant[] [is] not entitled to qualified immunity." *Maben v.*

*Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). To overcome Busacca's claim of qualified immunity on summary judgment, Plaintiff must show that the facts, considered in the light most favorable to him, would allow a reasonable jury to find that: "(1) the defendant violated a constitutional right; and (2) the right was clearly established." *Schulkers v. Kammer*, 955 F.3d 520, 532 (6th Cir. 2020).

The constitutional right at issue here arises from the Fourth Amendment, which protects the right of individuals to be free from searches and seizures without probable cause. *See* U.S. Const. amend. IV ("The right of people to be secure in their persons, houses . . . against unreasonable seizures . . . shall not be violated."). A warrant cannot be issued without a showing of probable cause. U.S. Const. amend. IV; *Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) (quotation marks and quotation omitted).

Determining the existence of probable cause requires courts to "consider the totality of the circumstances." *Id.* (citation omitted). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quotation marks and quotation omitted).

Following *Franks v. Delaware*, 438 U.S. 154 (1978), "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989). "Such reliance is unreasonable, and detention of an individual pursuant to such deceptive practices violates the Fourth Amendment." *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006). Accordingly, a plaintiff overcomes a qualified immunity defense in a Fourth Amendment case by "(1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003).

The Sixth Circuit has provided specific guidance on when omissions in a warrant application become a constitutional violation. In *Mays v. City of Dayton*, 134 F.3d 809 (6th Cir. 1998), the Court clarified that police officers commit a constitutional violation when, with the intention of misleading the court, they exclude critical information from a search warrant affidavit, *i.e.*, information that is critical to the finding of probable cause. *Id.* at 816; *see also Hale v. Kart*, 396 F.3d 721, 726 (6th Cir. 2005) ("[Upon] a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists.") (quotation omitted).

Busacca's motion devoted very little of his brief to qualified immunity. ECF 108, PgID 2572–73. In the first sentence of his motion, Busacca conceded that Plaintiff can overcome the qualified immunity defense for any of the constitutional claims with evidence that "Busacca knew the statements contained in the warrant request were intentionally false or that Busacca acted with reckless disregard for the truth[,] and that the statements lacked probable cause." ECF 108, PgID 2539. In doing so, Busacca conceded that the longstanding rule from *Franks v. Delaware*, 438 U.S. 154, and *Vakilian v. Shaw*, 335 F.3d 509, applied to Busacca's actions. Thus, the Court concludes that Busacca did not meaningfully contest that the Fourth Amendment right at issue was clearly established. *See* ECF 108, PgID 2539, 2572– 73.[10]

Busacca contested only the first prong of qualified immunity—violation of a constitutional right. *See id.* at 2550–51. Of course, once a qualified immunity defense is raised, the plaintiff bears the burden of rebutting the defense. *See Maben*, 887 F.3d at 269. When, however, a defendant concedes that the law was clearly established or fails to raise the issue, he waives the argument. *See Lipman v. Budish*, 974 F.3d 726, 749 (6th Cir. 2020) ("But nowhere, either in the district court or on appeal, do

---

[10] Although qualified immunity is an affirmative defense, Busacca failed to raise qualified immunity in his answer to the complaint on August 9, 2021. *See* ECF 32. Nor did he raise qualified immunity as a defense in his answer to the amended complaint on January 28, 2022. *See* ECF 55. In fact, Busacca included no affirmative defenses in either answer. *See* ECF 32, ECF 55. Instead, on February 1, 2022, Busacca filed a document entitled "affirmative defenses" that mentioned qualified immunity for the first time. ECF 60. The document was filed more than fourteen days after the amended complaint. *See* ECF 53; Fed. R. Civ. P. 15(a)(3); Fed. R. Civ. P. 8(c).

Defendants address qualified immunity with respect to . . . whether the right . . . was clearly established law."); *United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (quotation omitted); *see also Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) (discussing waiver versus forfeiture). The Court thus concludes that Busacca conceded that the law at issue was clearly established during the relevant time period and waived the argument.

But even if Busacca did not waive the issue, the Court would still conclude that the alleged constitutional violation was clearly established. As explained above, after *Franks v. Delaware* and its progeny, every reasonable police officer knows not to lie or mislead courts in warrant affidavits. *See Caskey v. Fenton*, No. 22-3100, 2022 WL 16964963, at *7 (6th Cir. Nov. 16, 2022) ("Seizure without probable cause, where the seizure is effected because of deliberately or recklessly made falsehoods by government officials, is the rare, 'obvious' kind of claim where the conduct is so wrong that the general rule clearly establishes the right."). The Sixth Circuit has held that it is "clearly established that '[p]olice officers cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court.'" *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015) (quoting *Gregory*, 444 F.3d at 758). And the Sixth Circuit has held that "it is clearly established that witness allegations fail to sustain probable cause when there is 'apparent reason to question the person's reliability.'" *Id.* at 433 (quoting *Logsdon v. Hains*, 492 F.3d 334, 343 (6th Cir. 2007)).

21

Busacca also had notice that unreliable statements from child abuse victims are not enough to sustain probable cause. *See id.* at 430 ("[P]robable cause does *not* exist where 'there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection.'") (quotation omitted).

In *Wesley*, a former elementary school counselor was accused of sexual assault by one of his students. *Id.* at 423–24. When a police officer applied for an arrest warrant, she omitted several material facts that undermined the reliability of the student's allegations against the counselor. *Id.* In a subsequent § 1983 suit against the officer, the district court granted a motion to dismiss, in part, based on qualified immunity. *Id.* at 427. On appeal, the Sixth Circuit reversed, and found that it was clearly established that the officer could not withhold evidence of the child's unreliability from the magistrate judge, and that it was clearly established that the officer could not make material misrepresentations (including by omission) to the court and then rely on the magistrate judge's determination of probable cause. *See id.* at 433. Consequently, even assuming arguendo that waiver did not apply, the Court would still conclude that the law applicable to the Fourth Amendment violations was clearly established.

Moreover, the Sixth Circuit has held that "officers, in the *process of determining whether probable cause exists*, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." *Ahlers v. Schebil*, 188 F.3d 365, 371–72 (6th Cir. 1999); *see also Gardenhire*

*v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) ("[T]he officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest."); *Wyniemko v. Ostin*, No. 03-cv-74749, 2005 WL 8169287, at *21 (E.D. Mich. Mar. 3, 2005) ("The Sixth Circuit has clearly recognized that officers cannot omit with impunity exculpatory evidence in obtaining an arrest warrant."). Finally, in *Ahlers*, the Sixth Circuit established that "a person has a right to be free from arrest based solely on an eyewitness account that is in some way untruthful or unreliable." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 282 (6th Cir. 2020). The cited cases would also have put a reasonable officer on notice about the scope of the rights afforded under the Fourth Amendment.

The law regarding malicious prosecution claims under the Fourth Amendment was clearly established during the relevant time period here. A malicious prosecution claim requires the plaintiff to prove, *inter alia*, that there was "a lack of probable cause for the criminal prosecution," which turns on the established law mentioned above. *Sykes*, 625 F.3d at 308. Busacca's sole argument in opposition to the malicious prosecution claim was that probable cause existed for the criminal prosecution; he conceded the other elements. *See* ECF 108, PgID 2549–50. In any event, the Sixth Circuit has held that "[i]t is clearly established that officers violate the Constitution by knowingly or recklessly making false statements that form probable cause for the plaintiff's arrest and prosecution." *Caskey*, 2022 WL 16964963, at *10 (citing *Gregory*, 444 F.3d at 758–59).

Because the other prong of the qualified-immunity analysis looks to the existence of a constitutional violation, the following discussion addresses that prong.

III.   Fourth Amendment Violations

Plaintiff alleged that Busacca violated the Fourth Amendment when he, to obtain a search warrant and an arrest warrant, misled the issuing court about the existence of probable cause. ECF 53, Pages 44–48. The Court will deny summary judgment on the Fourth Amendment claims because, viewing the facts in the light most favorable to Plaintiff, a jury could conclude that, for both warrants, Busacca showed reckless disregard for the truth by omitting information critical to the finding of probable cause with the intention of misleading the Court. *See Mays*, 134 F.3d at 816; *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 n.4 (6th Cir. 2005) (noting that the *Mays* standard applies to both search and arrest warrants).

A.   *Search Warrant*

To begin, the Court will explain why Plaintiff made a substantial preliminary showing that Busacca omitted information from the search warrant affidavit with the intent of misleading the Court. After discussing Busacca's intent to deceive, the Court will explain why the warrant would lack probable cause even if the falsehoods were stricken and the omissions added.

i.   Busacca's Intention to Mislead the Court

To overcome qualified immunity in a Fourth Amendment case, "a § 1983 plaintiff must make 'a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth.'" *Butler v. City of Detroit*, 936

24

F.3d 410, 418 (6th Cir. 2019) (quoting *Vakilian*, 335 F.3d at 517). The key to making such a showing is evidence that the officer had a "more culpable mental state," *i.e.*, he was reckless or willful rather than simply negligent. *Id.* at 418.

For cases involving the omission of disputed facts in a warrant, however, the Sixth Circuit applies a more specific standard. In *Mays v. City of Dayton*, it held that "except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." 134 F.3d at 816. Without the preliminary showing, the Court cannot proceed to the second part of the *Franks* inquiry, which examines "the affidavit including the omitted portions and determine[s] whether probable cause still exists." *Hale v. Kart*, 396 F.3d at 726 (quotation omitted).

Although Busacca made both omissions and falsehoods in the search warrant, the omissions are what was critical to the finding of probable cause. Accordingly, the Court will focus on the omissions and apply the *Mays* standard. Generally, to establish intent to mislead, plaintiffs must show more than "[t]he mere existence of omissions." *Id.* at 727.[11] "A plaintiff shows substantial evidence of deliberate

---

[11] In *Hale v. Kart*, the Sixth Circuit held, in part, that a plaintiff who simply argued that an officer "should have engaged in further investigation before seeking a warrant" could not satisfy the first prong of the *Mays* test. 396 F.3d at 727. But the Court also did "not foreclose the possibility that strongly material omissions could provide evidence of an intention to mislead." *Id.*

falsehood or reckless disregard when, for example, he presents proof that at the time the officer swore out the affidavit, she knew of or possessed information that contradicted the sworn assertions." *Butler*, 936 F.3d at 419.

Plaintiffs do not always have evidence of "the officer's knowledge or state of mind at the time the officer wrote the allegedly false affidavit." *Butler*, 936 F.3d at 420. Here, however, Busacca reviewed exculpatory documents as part of his investigation, none of which made it into the search warrant application or the arrest warrant swear-to. Specifically, Busacca admitted to reviewing the family court documents and the McDonald's recording. ECF 111-1, Pages 127–28, 196–201, 224.

Plaintiff also presented evidence from which a jury could conclude that Busacca covered up Kolodziej's involvement in the case, and that behavior showed cognizance of wrongdoing. After all, Busacca changed a police report to hide Kolodziej's involvement in the *MacMaster* case.

The Michigan State Police (MSP) do not generally permit changes to police reports after submission. ECF 102-14, PgID 1925. According to MSP Rule 5.1.5, "[o]nce a report has been submitted as complete by the investigating enforcement member and approved by a supervisory enforcement member, the information contained in the report shall not be changed or deleted unless authorization is received from the post or section commander." *Id.* At the request of Kolodziej, however, Busacca altered a months-old report. *See* ECF 111-9, Page 37–38; ECF 102-14, PgID 1932–33 (listing November 4, 2018 as the date of the original report).

Kolodziej asked Busacca to alter a paragraph that mentioned his name from the police report. ECF 111-9, Page 37–38; ECF 102-14, PgID 1925. According to Kolodziej, the paragraph jeopardized his grant funding, so he wanted it changed. ECF 111-9, Pages 37–38.[12] After getting permission from two Michigan State Police lieutenants, Busacca altered the report to remove all references to Kolodziej. *Id.*; *see also* ECF 102-14, PgID 1932–33 (original and altered report). And Busacca also removed the following two sentences:

> Det. Gerald was asked by a staff member at the Macomb Prosecutor's Office—due to his regular contact and familiarity with the staff there—to review a CSC investigation that occurred in the Oxford, MI area in 2016. Det. Gerald further stated that he agreed to review the complaint as a favor.

ECF 111-1, PgID 139; ECF 102-14, PgID 1932–33. By altering the report, Busacca thus ensured that readers of the report would never know that Kolodziej or the Macomb Prosecutor's Office (which lacked jurisdiction) were involved in the *MacMaster* case. Nor would anyone know that Gerald reviewed the complaint "as a favor."

Plaintiff also presented evidence that Busacca violated MSP rules when he revised the report. Detective Lieutenant Edward Price testified that Kolodziej's name should not have been removed from the incident report. ECF 111-11, Page 36. Instead, the revision "should have just dealt with the grant funding stuff, not removing [Kolodziej]." *Id.* But Busacca removed more than just the grant funding

---

[12] There is a genuine issue of fact as to whether the grant funding was Kolodziej's true motivation for changing the report. *See* ECF 102-14, PgID 1929–30.

language. Plaintiff therefore presented evidence that Busacca altered a police report *and* that he may have violated Michigan State Police policy, both to protect Kolodziej.

Kolodziej also asked Busacca to keep his name out of any testimony. ECF 111-9, Page 83. And so, on March 25, 2019, when Busacca testified in a Florida proceeding, he hid Kolodziej's involvement from the court to honor Kolodziej's request. *Id.*; *see generally* ECF 111-16, Page 17.

Beyond presenting evidence that Busacca covered up Kolodziej's involvement in the case, Plaintiff presented evidence that Busacca knew that the criminal case was rotten at the time he signed the search warrant affidavit. To prevail on a *Franks* claim, the plaintiff must show that "the affiant 'in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein.'" *United States v. O'Neill*, 94 F.4th 531, 539 (6th Cir. 2024) (quoting *United States v. Cican*, 63 F. App'x 832, 835–36 (6th Cir. 2003)), *cert. denied*, No. 24-5074, 2024 WL 4427322 (U.S. Oct. 7, 2024). The standard "goes to the officer's 'knowledge or state of mind at the time the officer wrote the allegedly false affidavit.'" *Id.* (quoting *Butler*, 936 F.3d at 420).

Here, Busacca testified that he entertained serious doubts about the case. At a meeting on January 23, 2019, two months before the execution of the search warrant, Busacca expressed concerns about the investigation to the Michigan Attorney General's Office. ECF 103-21. Busacca told the Office that he was worried about Johanna MacMaster's behavior, especially the McDonald's recording where she tried to use the abuse allegations as leverage to get Sean MacMaster to sign away his

parental rights. *Id.*; *see also* ECF 112-5, PgID 4501 (Busacca testifying about his concerns with the case); ECF 113-1 (transcript of McDonald's recording).[13] Busacca had previously expressed similar concerns about the case to Detective Gerald. *See* ECF 111-10, Page 14 (noting that Busacca and Gerald had "a mutual agreement that [they] both felt uneasy about some of Johanna's actions"). Busacca also knew that the Oakland County Prosecutor had already investigated the abuse allegations and declined to pursue charges. ECF 103-21. Although Oakland County believed that AM probably was assaulted, Busacca knew that they closed the case because they did not believe that AM was assaulted by Sean MacMaster. *Id.*

Notwithstanding his concerns about Johanna MacMaster and his knowledge that Oakland County had already concluded that Sean MacMaster did not assault AM, Busacca signed the search warrant affidavit, and omitted the very information that had caused him concern.

Next, Busacca swore to false information in the search warrant when he falsely characterized the 2018 Catholic Social Services (CSS) interviews with the Ortegas as forensic. *See* ECF 111-17, PgID 4355. But the CSS interviews were not forensic. ECF 112-1, PgID 4451; *see also* ECF 113-9, PgID 4765. By describing the interviews as forensic, however, Busacca falsely inflated their objectivity.

Finally, although the aforementioned facts are enough, on their own, to establish Busacca's intent to deceive, the Court notes that the severity of the

---

[13] Busacca later admitted that the recording "doesn't look good" because "[i]t looks like there's a motive" behind Johanna's allegation. ECF 112-5, PgID 4501.

omissions (*e.g.*, not mentioning that the abuse victim admitted to a court-appointed therapist that she lied about the abuse) would further support a finding of deceptive intent.

      ii.   <u>Lack of Probable Cause</u>

Having concluded that Plaintiff made a strong preliminary showing that Busacca omitted critical information from the search warrant affidavit with an intention to mislead, the Court can proceed to the next part of the *Franks* analysis— whether probable cause to search still exists once the omissions are added and the falsehoods removed. *See Hale*, 396 F.3d at 726 (Upon "a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists.") (quotation omitted).

 "Probable cause for a search warrant exists if 'the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched.'" *Mays*, 134 F.3d at 814 (quoting *Greene v. Reeves,* 80 F.3d 1101, 1106 (6th Cir. 1996)).

Here, the search warrant covered the person of Sean MacMaster, his car, and his cell phone. ECF 111-17, PgID 4354. The search warrant sought, *inter alia*, evidence "of the crime of possession or distribution of child sexually abusive material." *Id*. According to the warrant, because of the allegation that Sean

MacMaster abused AM, and because people who use children as sexual objects often possess child pornography, probable cause existed to believe that Sean MacMaster had child sexual abuse material on his person, in his car, or on his cell phone. *See id.* at 4355–57. Of course, "search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found." *Mays*, 134 F.3d at 814. Here, however, the sole basis to believe that Sean MacMaster's property had evidence of a crime was the allegation that he abused AM. *See* ECF 111-17. Without that allegation, the warrant contained no basis to think that there was evidence of a crime on Sean MacMaster's person, car, or cell phone. And so, even though the document is a search warrant and not an arrest warrant, the Court's analysis must nevertheless focus on the abuse allegations.

The Court previously enumerated several omissions from the search warrant. And it noted one falsehood. As corrected, the search warrant would have shown the following: AM admitted to a court-appointed therapist that she lied about the abuse, ECF 113-8, PgID 4759; a court-appointed expert concluded that AM's allegations of abuse at the Oakland County CARE House were unreliable, ECF 111-22, PgID 4392; a Florida court concluded that AM's abuse allegations were so unreliable that they were inadmissible as evidence, ECF 113-7, PgID 4750; Michigan Child Protective Services found "insufficient evidence" that Plaintiff abused AM, Oakland County found serious "red flags" with the abuse allegations, and there was "no medical confirmation of sexual abuse," ECF 113-7, PgID 4746; Johanna MacMaster promised to drop the abuse allegations, which she did not believe were truthful, if Plaintiff

signed away his parental rights, ECF 113-1, PgID 4678, 4692; AM made contradictory statements about the abuse itself, *see, e.g.*, ECF 112-3, PgID 4464 (AM naming *Johanna* MacMaster as the one who put salami in her butt); ECF 110-4, PgID 3705, 3747–48 (AM denying that anyone ever took nude photographs of her); and some evidence suggested that Johanna MacMaster coached AM in making the allegations. ECF 107-2, PgID 2225. Finally, Busacca falsely characterized the 2018 Ortega interviews as forensic. *See* ECF 111-17, PgID 4355; ECF 112-1, PgID 4451.

Once the omissions are added to the affidavit and the falsehoods are removed, probable cause to search does not exist.[14] The search warrant would have had the allegations from the CARE House interviews and the non-forensic Ortega interviews. *See* ECF 111-17, PgID 4355. But, as Busacca likely knew, the Florida court was so convinced that the allegations lacked credibility that it ordered reunification therapy between Sean MacMaster and his daughter with an eye toward overnight visitation.

---

[14] Other courts have come to similar conclusions. For instance, in *Osborne v. Georgiades*, the Fourth Circuit considered a Fourth Amendment-based § 1983 claim against a police officer who arrested a father for the alleged sexual abuse of his daughter. 679 F. App'x 234, 234–35 (4th Cir. 2017). After an arrest warrant was issued, the father was incarcerated for eight months. *Id.* at 236. But the state later decided to drop the prosecution. *Id.* When the father then brought a §1983 claim, he alleged, *inter alia*, that the police officer "unlawfully omitted certain key facts from the warrant application." *Id.* at 238. Like here, the child victim in *Osborne* denied that she was sexually abused by her father and a medical exam revealed no physical signs of sexual abuse. *Id.* at 239. The police officer, however, made no mention of these facts in the *Osborne* arrest warrant. *Id.* Accordingly, the Fourth Circuit held that the omissions were necessary to the magistrate's finding of probable cause. *Id.* at 239. Here, the materiality of the omissions is much more apparent. In addition to omitting AM's denial and the medical examinations, Busacca also omitted evidence that Plaintiff's ex-wife was using the abuse allegations to gain leverage in their ongoing custody battle, contradictory details about the abuse itself, and the like.

*See* ECF 112-3, PgID 4474, 4476. Remarkably, the court's order came *before* AM admitted to lying about the abuse allegation, which only further undermined the credibility of the allegations. ECF 113-8, PgID 4759–60. After AM admitted to lying, the only new evidence presented in support of the search warrant that was *not* considered by the Florida court was the non-forensic interviews with the Ortegas. Considered alongside the mountain of exculpatory evidence, however, the interviews do not salvage a finding of probable cause.

No reasonable person, looking at the evidence, would believe that evidence of child sexually abusive material could have been found on Sean MacMaster's person, car, or cell phone. Judge Kostin, who authorized the search warrant, later swore that she would not have issued the warrant with just a handful of the aforementioned omissions. Having conducted an independent analysis of the facts that Busacca knew or should have known at the time he signed the search warrant affidavit, the Court concludes that the omissions were material to the finding of probable cause; their addition destroys probable cause. The Court will therefore deny summary judgment on the Fourth Amendment claim regarding the search warrant.

### B.    Arrest Warrant

Plaintiff also presented evidence that Busacca intentionally omitted from the arrest warrant affidavit information that was critical to the finding of probable cause with the intention of misleading the Court. *See Mays*, 134 F.3d at 816; *Voyticky*, 412 F.3d at 677 n.4. "Probable cause [to arrest] exists if the police officers have knowledge, at the time of arrest, of information sufficient to warrant a reasonable man to believe

that a crime has been committed." *United States v. Pepple*, 707 F.2d 261, 263 (6th Cir. 1983). As before, Plaintiff made a strong preliminary showing that Busacca omitted the information with the intent of misleading the Court. And the warrant would lack probable cause once the falsehoods were stricken and the omissions added. *See Hale*, 396 F.3d at 726.

With the exception of references to the involvement of the Oakland County Prosecutor's Office and reunification therapy, Busacca left out the same eight pieces of exculpatory information from the arrest warrant that he omitted from the search warrant. *Compare* ECF 111-17, *with* ECF 111-18. Since obtaining the search warrant, the only new evidence presented by the police was the forensic evidence from the Orr home.

iii.   <u>Intention to Mislead the Court</u>

For the same reasons as the search warrant, the Court finds that Plaintiff made a strong preliminary showing that Busacca omitted information from the arrest warrant with the intent of misleading the Court.

As previously noted, Busacca changed a police report to hide Kolodziej's involvement in the *MacMaster* case; he hid Kolodziej's involvement from the court in Florida; he hid the existence of the McDonald's recording from the court (despite being so concerned about it that he brought it to the attention of the Michigan Attorney General's Office); he included the same false characterization of the Ortegas' interview in the arrest warrant; and he omitted almost all the same information in the arrest warrant that he omitted from the search warrant. Busacca also included

falsehoods in the arrest warrant, discussed *post*, namely characterizing the allegations as "consistent" when they were anything but. Accordingly, Plaintiff presented enough evidence to make a strong preliminary showing of deceptive intent by Busacca.

     iv.   <u>Lack of Probable Cause</u>

The Court already determined that the police lacked probable cause to believe that evidence of a crime would be found on Sean MacMaster's person, devices, or car. The same evidence that shattered probable cause for the search warrant would have destroyed probable cause for the arrest warrant, *viz.*, AM admitted to lying about the abuse, doctors never found any medical evidence of abuse, a Florida court previously found her allegations to be not credible, etc.

For the arrest warrant, however, Busacca also included forensic evidence obtained from the Orr home. *See* ECF 111-18, Page 8. But a jury could easily find that Busacca mischaracterized the forensic evidence to try to corroborate the allegations when, in fact, the evidence did no such thing.

At first blush, the possible discovery of seminal fluid might seem to support AM's allegations. But just because evidence is icky does not make it inculpatory. Here, more than *three years* after the last instance of alleged abuse, investigators found what might have been Sean MacMaster's seminal fluid in the basement room where he was staying at his parent's home. ECF 110-12, PgID 4108; ECF 110-9, PgID 4085, 4087, 4091; ECF 110-2, PgID 3678. Such evidence simply does not corroborate the years-old abuse allegations, especially because the allegations that involved

semen supposedly happened in the *bathroom* of the Orr home. Busacca also personally knew the space was being used as a bedroom. *See* ECF 110-2, PgID 3678 (incident report from Busacca describing the room that Sean MacMaster was staying in). In sum, the evidence does not corroborate the allegation that Sean MacMaster abused his daughter.

A reasonable jury could find that, after Busacca failed to find any evidence of child sexual abuse material at the Orr home, he deliberately stretched the truth to mislead Judge Soma and get the arrest warrant.

Beyond the omissions and the forensic evidence, however, the Court also needs to correct the false evidence contained in the arrest warrant to ensure that the falsity was material. As before, Busacca lied about the Ortega interviews being forensic. Moreover, he falsely swore that the search warrant results and DNA testing "fully corroborat[ed] AM's several accounts of how she observed her father's snake, penis, spitting on the floor." ECF 111-18, Page 8. AM, however, had previously alleged that the abuse involving ejaculation occurred in the *bathroom* rather than the makeshift bedroom in the basement. *See* ECF 110-3, PgID 3700 (noting that "all the times" Dad's snake spit "happened in the bathroom on the floor"). And AM previously said that the snake was "green with black eyes," said "boo," and lived "in a cage." ECF 111-1, Pages 191–92; *see also* ECF 110-2, PgID 3646.

Finally, Busacca swore that AM's claims were "consistent" and "credible." Perhaps "credible" is a matter of opinion. But a reasonable jury could certainly find that Busacca lied when he characterized the abuse allegations as "consistent." Even

setting aside the fact that AM *admitted to lying about the abuse*, the allegations themselves contained numerous contradictions. *See, e.g.*, ECF 112-3, PgID 4464 (AM naming *Johanna* MacMaster as the one who put salami in her butt); ECF 110-4, PgID 3705, 3747–48 (AM denying that anyone ever took nude photographs of her).

In sum, the addition of the omitted information and the deletion of the falsehoods in the warrant would have destroyed probable cause to arrest Sean MacMaster. The Court will thus deny summary judgment on the Fourth Amendment claim regarding the arrest warrant.

II.    Malicious Prosecution

Plaintiff alleged in Count III that Kolodziej, Busacca, and Johanna MacMaster violated his Fourth Amendment rights by "intentionally and maliciously institut[ing] criminal charges for Plaintiff without probable cause." ECF 53, PgID 823. Specifically, Plaintiff argued that "requesting a warrant without probable cause which contained false information and omitted relevant and material information" supported a claim for malicious prosecution. *Id.* Malicious prosecution under the Fourth Amendment "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006) (quotation marks and quotation omitted).

To succeed on a § 1983 malicious prosecution claim, a plaintiff must prove: (1) "that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute"; (2) "that there was a lack of probable cause for the criminal prosecution"; (3) "that, as a

consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure"; and (4) that "the criminal proceeding was resolved in the plaintiff's favor." *Sykes*, 625 F.3d at 308–09 (alterations omitted).

Busacca's sole argument in opposition to the malicious prosecution claim was that probable cause existed for the criminal prosecution. *See* ECF 108, PgID 2549–50. As discussed previously, however, probable cause did *not* exist for the search warrant or the arrest warrant. As for the remaining elements of a malicious prosecution claim, Busacca admitted that he assisted in initiating criminal prosecution against Plaintiff, that Plaintiff suffered a deprivation of liberty, and that the case was ultimately dismissed without prejudice, thereby satisfying the remaining three elements. *See id.* at 2550. Accordingly, the Court will deny summary judgment as to the malicious prosecution claim.

III.   <u>Civil Conspiracy</u>

Plaintiff also alleged that Kolodziej, Busacca, and Johanna MacMaster engaged in a civil conspiracy to "prosecute Plaintiff for alleged crimes for which Defendants knew or had reason to know were without probable cause." ECF 53, PgID 825. "A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (quotation marks and quotation omitted). To prevail on a civil conspiracy claim, Plaintiff must show that (1) a single plan existed, (2) the defendants shared in the general conspiratorial objective to deprive Plaintiff of his constitutional (or federal statutory) rights, and (3) an overt act was committed in furtherance of the

conspiracy that caused injury to Plaintiff. *Id.* "A plaintiff, however, need not allege or produce direct evidence of a conspiracy; circumstantial evidence may provide adequate proof." *Stillwagon v. City of Delaware*, 175 F. Supp. 3d 874, 902 (S.D. Ohio 2016) (quotation marks and quotation omitted).

Busacca argued that Plaintiff did not meet the elements of a civil conspiracy under § 1983 because Plaintiff presented no evidence that "there was a plan shared by the defendants to deprive Plaintiff of his constitutional rights." ECF 108, PgID 2552. He also argued that there was no "overt act by any of the defendants in furtherance of the conspiracy." *Id.*

Plaintiff satisfied the first and second elements of civil conspiracy because he produced facts from which a jury could find that Busacca, Kolodziej, and Johanna MacMaster acted on a single plan to unlawfully prosecute Sean MacMaster without probable cause.

From the evidence, a jury could find that Johanna MacMaster made allegations she knew to be false, tried to use the prosecution as leverage to force her ex-husband to give up his parental rights, and enlisted law enforcement in the scheme. *See* ECF 113-1, PgID 4678, 4692. Kolodziej, who had a romantic relationship with Johanna's cousin, drafted the deceptive search warrant and arrest warrant materials. ECF 112-2, PgID 4457–58; ECF 112-1, PgID 4438; ECF 111-1, Pages 163, 166. And Busacca, who was friends with Kolodziej, had actual knowledge of Johanna's improper motives because he listened to the McDonald's recording but nevertheless presented deceptive information to the Court. ECF 111-9, Page 7; ECF

103-21; ECF 111-17, PgID 4354 (search warrant affidavit); ECF 111-18, Page 3 (swear-to in support of arrest warrant).

Plaintiff also presented evidence that Busacca altered a police report to conceal the involvement of Kolodziej in the *MacMaster* case. *See* ECF 111-9, Page 37–38. Because Busacca altered official documents, possibly in violation of Michigan State Police protocol, at the request of Kolodziej, a reasonable jury could conclude that Busacca was a full, knowing participant in the conspiracy.[15]

Finally, as to the last element, Plaintiff presented facts sufficient to satisfy the "overt act" prong of civil conspiracy. *See Bazzi*, 658 F.3d at 602. "[T]he overt-act element requires only that at least one of the alleged conspirators committed an overt act or omission in furtherance of the conspiracy." *Webb v. United States*, 789 F.3d 647, 671 (6th Cir. 2015). The parties agree that Busacca sought and obtained the search and arrest warrants. Moreover, he took a number of acts to obscure the participation of at least one other participant. Each constitutes an overt act.

For the above reasons, the Court will deny summary judgment as to the civil conspiracy claim.

---

[15] Busacca testified that he did not want to edit the police report. ECF 111-1, Page 146. But testimony from his superiors suggests that Busacca never expressed any reservations about covering up Kolodziej's involvement. ECF 111-14, Page 7. Detective First Lieutenant Robert Weimer testified that Busacca never expressed any concerns and that "he seemed on board" with the changes. *Id.* In any event, the contradictory evidence presents a genuine issue of material fact for the jury.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that Busacca's motion for summary judgment [108] is **DENIED**.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: January 27, 2025