## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

**SEAN MACMASTER**,

    Plaintiff,    Case No. 21-cv-11052

             Hon. Stephen J. Murphy, III

vs.


**DAVID BUSACCA**, et al,

    Defendants.

_____/

### MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiff, Sean MacMaster, through counsel, moves this Court, pursuant to Fed. R. Civ. P. 50(a) to enter judgment in his favor on the issue of liability as to each count.

        Respectfully submitted,

Dated: August 7, 2025    /s/ Melissa Freeman
            Melissa Freeman
            BLANCHARD LAW
            Attorneys for Plaintiff
            309 S Lafayette, Ste 208
            Greenville, MI 48838
            (616) 773-2945
            melissa@blanchard.law

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

**SEAN MACMASTER**,
        Plaintiff,        Case No. 21-cv-11052
                        Hon. Stephen J. Murphy, III

vs.


**DAVID BUSACCA**, et al,
        Defendants.
_____/

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR**
**JUDGMENT AS A MATTER OF LAW**


**TABLE OF CONTENTS**

STATEMENT OF ISSUES PRESENTED.................................................. 3

CONTROLLING AUTHORITIES ........................................................... 4

STATEMENT OF FACTS....................................................................... 5

ARGUMENT ..........................................................................................13

CONCLUSION AND RELIEF REQUESTED ........................................20

## STATEMENT OF ISSUES PRESENTED

Whether the Plaintiff is entitled to judgment as a matter of law because "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [Defendants]". Fed. R. Civ. P. 50.

Because the overwhelming evidence is that both defendants turned a blind eye to exculpatory information that would have shattered probable cause, the Court should grant judgment as to liability and submit the question of damages to the jury.

# CONTROLLING AUTHORITIES

## Cases

*Beck v. Ohio*, 379 U.S. 89, 91 (1964) ........................................................15

*Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) ...........................14

*Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)....................15

*Hale v. Kart*, 396 F.3d 721 (6th Cir. 2005) .......................................14, 20

*Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)...........................14, 15

*Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878) ......................................14

*Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010) .......................14

*United States v. Harness*, 453 F.3d 753, 754 (6th Cir. 2006) .................15

*Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) ....14

*Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) ...........................15

## STATEMENT OF FACTS

This case arises from Plaintiff Sean MacMaster's claims under 42 U.S.C. § 1983, alleging that he was wrongfully arrested and prosecuted based on fabricated evidence and material omissions in warrant affidavits submitted by law enforcement. Trial commenced on July 23, 2025. The Plaintiff rested on August 4, 2025 and the Defendants rested on August 7, 2025.

The evidence produced at trial conclusively established that Defendants omitted exculpatory evidence and falsely presented inculpatory evidence in seeking arrest and search warrants for Plaintiff.

Trial testimony shows that in early 2016 Johanna MacMaster began accusing her former husband, Sean MacMaster, of sexually abusing their four-year-old daughter, A.M. But every official body that examined the allegations over the next two years—Child Protective Services, the Oakland County Sheriff's Department and Prosecutor's Office, the Federal Bureau of Investigation, Homeland Security, the Lapeer Post of MSP, and three separate physicians—closed their files or found no corroborating medical evidence. Detective Shane Freiberg and pediatrician Dr. Marcus DeGraw confirmed at trial that their respective

criminal and medical investigations turned up nothing to substantiate the claims, and defendant-officer David Busacca acknowledged the same outcome in his own case notes.

The professionals the Florida family-court judge appointed to evaluate the situation reached equally damning conclusions about reliability. Court-appointed forensic-psychology expert Dr. Katherine Jacobs both reported and explained to the jury that the child's statements bore the classic hallmarks of influence. Consistent with those opinions, a certified copy of a February 2017 Florida family-court order—introduced through Busacca—ruled A.M.'s hearsay statements inadmissible because they "lack[ed] sufficient trustworthiness." The point came into even sharper focus when the jury heard about the CARE House interviews: A.M. contradicted herself on key details (denying knowing what "salami" was, claiming it was a piece of salami, inconsistent stories about talking green snakes, and cutting the legs from frogs with scissors that were actually fingers) and, in her earliest session, flatly denied anyone had ever taken nude photographs of her. In the early January 2016 allegation captured by her mother, A.M. claims it is her mother, not Plaintiff, who "put the salami in [her] butt". Dr. Jacobs explained in her report and

testimony how such internal inconsistencies, compounded by repeated questioning, are strong evidence of contamination and negatively impact reliability.

The jury also heard uncontroverted evidence that A.M. ultimately recanted. During her first therapy session, she told Dr. Stulberg, "Daddy never hurt me," adding that her mother pressured her to keep accusing him. A recording of a January 23, 2016 meeting at McDonald's—played through Detective Freiberg and reviewed by Busacca—captured Johanna offering to "drop everything" if MacMaster would relinquish his parental rights, underscoring the custody leverage at play. She implored Mr. MacMaster to "stop this war" and referred to what she was offering as Mr. MacMaster's "get-out-of-jail-free card". During this recording, she lies about the source of the allegations and predicts the later allegations against Mr. Orr, which surface to law enforcement only when her first allegations are declined by the Oakland Prosecutor.

Dr. Jacobs' written report (Plaintiff's Exhibit W) and testimony linked those events to a broader pattern of parental influence: rewards for disclosures, repeated rehearsals, and other contamination triggers emanating from Johanna. Dr. Jacob's report was emailed by Sean's

criminal defense lawyer on March 25, 2019 – before the arrest warrant – and Busacca admits that he read it.

Against that backdrop, defendant Brian Kołodziej admitted on the stand that the August 2018 "Ortega" interviews were not forensic interviews at all, even though they described them to the magistrate and in the search warrant affidavit as "forensic interviews." Likewise, Mary Ortega testified that the assessment done of A.M. did not follow forensic interview protocol and testified to several examples where the forensic interview protocol was violated—toys, rewards, reinforcing language, and multiple interviews.

None of the exculpatory points just summarized—the prior unfounded agency investigations, negative medical findings, expert unreliability opinions, A.M.'s recantation, the Florida court's credibility ruling, Johanna's recorded extortionate threats, Mr. MacMaster's passed polygraph, the child's contradictory statements, or the evidence of coaching—made their way into either the search- or arrest-warrant testimony. The affidavits and testimony affirmatively mislabeled the Ortega interviews as "forensic" and the DNA evidence as "semen". When those omissions are supplied and that misstatement corrected, the

affidavits collapse; they furnish no objective basis on which a reasonable officer or magistrate could have found probable cause to search or arrest Mr. MacMaster.

Mr. Busacca resisted throughout trial that he acted with intention to prosecute Mr. MacMaster without probable cause. However, three key pieces of evidence show that he was a willful, knowing participant in the omission of material information and efforts to prosecute Mr. MacMaster without probable cause.

First, Mr. Busacca was the person who removed the reference to Brian Kolodziej and, notably, removed the reference to the investigation being undertaken as a favor to a Macomb County Prosecutor's Office Employee. *Compare* Pl. Ex. A and Ex. B. Second, Mr. Busacca received an email from Mr. Kolodziej on March 11, 2019, days after the search warrant which stated, "I'm so glad that Mike Gerald put this in your hands." Joint Ex. 11. The overwhelming probative force of the evidence is that Mr. Kolodziej, not Mr. Gerald put the case in Mr. Busacca's hands. Finally, the next day at 7:29pm, Mr. Kolodziej emails a draft letter to the Florida Family Court judge with the intention that Mr. Busacca send it out. Joint Ex. 29. Mr. Busacca placed the letter on his official letterhead.

Pl. Ex. D. At 9:07pm, Busacca drafts an email back to Kolodziej and Hagaman-Clark stating, "Please see attached for the letter I drafted to advise Judge Nilon of the 8th Circuit Court of Florida of the MacMaster investigation currently underway." Def. Busacca Ex. 136. There was simply no reason for Mr. Busacca to send a copy of Kolodziej's letter back to him with the note that Busacca himself had "drafted" it unless he was attempting to create a misleading record for Hagaman-Clark and others.

Both Mr. Busacca and Mr. Kolodziej turned a blind-eye to exculpatory material, while focusing on unreliable evidence they viewed as inculpatory. For instance, they interviewed Johanna extensively, while refusing to speak to Mr. MacMaster. They both testified they were focused exclusively on the child's statements, while willfully ignoring the Florida family court's order that the child's statements were unreliable after a 6-day contested hearing, as well as orders intended to address the coaching and influence that Johanna was exerting over the child. They interviewed the Ortegas, who testified she had only spoken to Johanna who refused to sign a release, but did not interview Dr. Stulberg or Dr. Jacobs, both court-appointed experts chosen by both the MacMasters.

Even when exculpatory evidence was presented to them, they chose not to consider it. For instance, the police polygraph was disregarded as immaterial, but the Ortega notes which indicated that Johanna was discussing the disclosures and refusing to sign a release with the child was lauded as evidence which supported the finding of probable cause. Likewise, individuals who expressed concern about the case, like Detective Sergeant Buchan, who testified he would not touch the case with a ten-foot pole, were ignored.

The evidence showed that the other individuals who played a role in the MacMaster case were lied to about the case origins and details. Trooper Sutton, who testified that she provided a template and maybe a page of the search warrant, was unaware that Mr. Kolodziej was in a romantic relationship with the complainant's family member. Post Commander Brodeur, who had only spoken to Busacca and Kolodziej before approving the investigation, was unaware of the true origins, which would have caused him to question the motives had he known. Lieutenants Weimer and Price were lied to about the basis for the police report changes they authorized, told that only a sentence was being changed, and the changes were merely clerical when they were clearly

substantive, *see* Joint Exhibit 14. Finally, Busacca claimed that Gerald was the original investigator in an attempt to shield himself from the connection to Kolodziej and the concealment of the origins, but Gerald testified he did not investigate, rather, he compiled materials. He testified that the testimony that Busacca claimed Gerald was looking for a federal nexus was simply untrue.

The testimony of Danielle Hagaman-Clark, an oft-cited witness by the defense for the proposition that this case was done with approval, testified to the lies of the Defendants. Ms. Hagaman-Clark was unequivocal that she was not in charge of the MacMaster case, and that Mr. Kolodziej was always involved—in everything. Ms. Hagaman-Clark's understanding, which she gained from Kolodziej, regarding the origins of this case were that it came from an FBI task force that Mr. Busacca and Mr. Gerald were on, that Kolodziej was asked to take a second look. The origin mattered to Ms. Hagaman-Clark because she believes it was not appropriate for a prosecutor to be involved in a case where there was personal involvement, and that the entanglement of personal and professional life was unethical and problematic for the case. Additionally, she viewed the police report changes as substantive, and that they had

the effect of concealing the true origins of the case. She was unaware those changes were made during her involvement in the case. She believed the changes must have mattered, or Defendants would not have made them. In her experience, she would not have an officer change a report.

## ARGUMENT

Fed. R. Civ. P. 50(a) provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."

Such a motion may be made once the opposing party has been "fully heard". *Id.* "[A] party has been fully heard when he rests his case." *Pakenas v. State Farm Ins. Co.*, 488 F. App'x 43 (6th Cir. 2012) quoting *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 611 (5th Cir. 2004). And the "motion *must* specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2); *Hanover*

*Am. Ins. Co. v. Tattooed Millionaire Entm't, LLC*, 974 F.3d 767, 783 (6th Cir. 2020).

## I. THE QUESTION OF PROBABLE CAUSE IS A LEGAL QUESTION FOR THE COURT AND SHOULD BE RESOLVED IN PLAINTIFF'S FAVOR.

Probable cause, or rather, lack thereof, is central to this case. *See Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010); *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). In § 1983 actions, the existence of probable cause normally presents a jury question, however, if there is only one reasonable determination, then a court may decide it. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). When no material dispute of fact exists, probable cause determinations are legal determinations that should be made by a court. *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.") Where, as here, the facts that "relate to probable cause are not in dispute the question of probable cause retains its legal character and should be decided by a judge." *Hale v. Kart*, 396 F.3d 721 (6th Cir. 2005).

As it pertains to the existence of probable cause, there is only one possible reasonable determination—that probable cause does not exist in the instant case. *Pyles, supra*, 60 F.3d at 1215. "The existence of probable cause …. depends on 'whether, at the moment the arrest was made, … the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed . . . [the] offense." *United States v. Harness*, 453 F.3d 753, 754 (6th Cir. 2006) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "A probable cause determination is based on the 'totality of the circumstances,' and must take account of 'both the inculpatory *and* exculpatory evidence.'" *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (emphasis in original) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000).

The facts elicited at trial conclusively establish that, had the exculpatory information not been suppressed, there was not probable cause to arrest or search Mr. MacMaster.

**A. The proofs at trial establish that the averments in the search and arrest warrant applications did not supply probable cause when the exculpatory omissions were included.**

**Search Warrant**

15

In passing on the summary judgment motions, this Court considered "whether probable cause to search still exists once the omissions are added and the falsehoods removed." *See* Opinion Denying SJ, ECF No. 125, PageID.4965. The Court outlined eight "types of possibly exculpatory information from [Busacca's] affidavit" for the search warrant, as well as one falsehood. *Id.* at PageID.4941-46. The omissions include: (1) that AM disclosed to a court-appointed therapist that she lied about the abuse; (2) that a court-appointed expert found that AM's CARE House allegations were unreliable; (3) the Florida family court concluded that AM's allegations were unreliable and inadmissible; (4) that CPS and Oakland County reviewed and declined; (5) that Johanna used the allegations to gain leverage in her custody battle in the McDonald's recording; (6) the contradictory statements about the abuse itself, (7) direct evidence that Plaintiff never took nude photographs of AM; (8) that there was evidence of coaching and contamination by Johanna. *Id.* In addition to the omissions, Busacca "falsely characterized the interview with the Ortegas as a forensic interview." *Id.* at PageID.4946.

16

Of these eight types of omissions and one falsehood, this Court concluded that Plaintiff "made a substantial preliminary showing that Busacca omitted information from the search warrant affidavit with the intent of misleading the Court." *Id.* at PageID.4959. Having found evidence that Busacca intentionally misled the state court, the Court proceeded with the second part of the *Franks* inquiry: including the omitted portions, removing the falsehoods, and determining whether probable cause exists. *Id.* at PageID.4960. In its analysis, the Court cited to the police report changes, as well as "evidence that Busacca knew that the criminal case was rotten at the time he signed the search warrant affidavit." *Id.* at PageID.4963.

With both prongs met, this Court concluded that "[o]nce the omissions are added to the affidavit and the falsehoods are removed, probable cause to search does not exist." *Id.* at PageID.4967. Further concluding that "[n]o reasonable person, looking at the evidence would believe that evidence of child sexually abusive material could have been found on Sean MacMaster's person, car, or cell phone…", this Court held that with the omissions included, "their addition destroys probable cause." *Id.* at PageID.4968.

Of the eight types of omissions and two falsehoods, evidence was presented at trial for each of the eight types. First, Dr. Stulberg testified about AM's statements that she lied about the abuse, and Busacca testified that he did not view that as material. Second, Dr. Jacob's testified that AM's statements were unreliable due to contamination and taint, and likewise, Busacca testified that he viewed her expert opinion as immaterial. Third, Judge Nilon's child hearsay order was entered into evidence, and Busacca testified that he viewed that as immaterial. Additionally, Busacca testified that he did not interview the court-appointed experts involved stating, that he could not interview everyone involved. Fourth, the evidence showed the various denials from Oakland County and CPS. Fifth, the McDonald's recording and testimony demonstrated Johanna's intent to use the allegations to gain leverage in the custody matter. Sixth, the child's contradictory and nonsensical were addressed. Seventh, the evidence that AM explicitly denied having nude photos taken of her, which is in the admitted Carehouse video, as well as evidence from Brian Laity that there was nothing found on Mr. MacMaster's devices of any evidentiary value. Eighth, there was evidence of Johanna's coaching, contamination, and influence on the child. Finally,

the testimony from Ms. Ortega, as well as admissions from Mr. Kolodziej, was that the Ortega interviews were not forensic interviews, as was falsely claimed in the arrest warrant.

The proofs at trial convincingly mirror the evidence discussed in the Court's summary judgment opinion and entitle Mr. MacMaster to judgment as a matter of law.

### Arrest Warrant

As to the arrest warrant, this Court stated, "[t]he same evidence that shattered probable cause for the search warrant would have destroyed probable cause for the arrest warrant". *Id.* at PageID.4970. However, the arrest warrant included Busacca's falsehoods about the forensic evidence. *Id.* After considering the new information, this Court concluded, "the addition of the omitted information and the deletion of the falsehoods in the warrant would have destroyed probable cause to arrest Sean MacMaster." *Id.* at PageID.4972.

In addition to the eight types of omissions and one falsehood from the search warrant affidavit, the arrest warrant included falsehoods about the forensic evidence in this case. See above for analysis of search warrant affidavit. The evidence regarding the forensic evidence comes

from the laboratory reports, which indicate that the results of the DNA evidence were the "possible presence of seminal fluid" but that it could not be confirmed. There is no evidence that establishes the DNA was in fact, semen, as Kolodziej had included in the swear to script, and as Busacca falsely swore under oath.

### B. A jury may only resolve factual disputes regarding the facts underlying a probable cause determination.

In the Sixth Circuit, the jury may resolve "reasonable disputes of material fact" that pertain to the "facts underlying a probable cause determination." *Hale, supra*, 396 F.3d at 728. Because the underlying facts that relate to probable cause have been proven by Plaintiff, the "question of probable cause retains its legal character and should be decided by the judge." *Id.*

This Court should find that with the inclusion of the intentionally omitted material, and the deletion of the falsehoods, there was no probable cause to arrest Plaintiff as a matter of law.

### CONCLUSION AND RELIEF REQUESTED

Now that both defendants have been fully heard, this Court, as the arbiter of the probable cause determination in this case, should grant

judgment in Plaintiff's favor on the issue of probable cause and submit only the question of damages to the jury.

Respectfully submitted,

Dated: August 7, 2025             /s/ Melissa Freeman
                                  Melissa Freeman
                                  BLANCHARD LAW
                                  Attorneys for Plaintiff
                                  309 S Lafayette, Ste 208
                                  Greenville, MI 48838
                                  (616) 773-2945
                                  melissa@blanchard.law

## CERTIFICATE OF SERVICE

I certify that on August 7, 2025, I filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing to all counsel of record.

Dated: August 7, 2025             /s/ Melissa Freeman
                                  Melissa Freeman